**Marshall T. GREGORY, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16778.**

United States Court of Appeals
Fifth Circuit.

March 12, 1958.

**106**

Herbert A. Ringel, H. A. Stephens, Jr., Atlanta, Ga., Smith, Field, Doremus & Ringel, Atlanta, Ga., of counsel, for appellant.

James W. Dorsey, U. S. Atty., John W. Stokes, Jr., Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is an appeal from a conviction for mail fraud, 18 U.S.C.A. § 1341, after a jury verdict of guilty on Count One of a four-count indictment. The substantive questions are whether the transaction involved constitutes a mail fraud within the Act, and if so, whether, on a case almost wholly circumstantial, it was made out with requisite sufficiency. A few procedural questions are also presented.

The scheme to defraud and a use of the mails in its furtherance as set forth in paragraph 1 of Count One (repeated by reference in all other counts) and amplified by the Bill of Particulars applicable to all counts can be briefly summarized. In the fall of 1954 Crosley Division of AVCO Manufacturing Corporation had a nationwide weekly football contest. Contestants had to obtain blanks from authorized dealers. To complete the blanks, the contestant had (a) to indicate the winner of each of twenty intercollegiate football games to be played on Saturday of that week, (b) predict the correct score of the "Gridiron Special," and (c) fill out the last line of the inevitable jingle. The entry had to be postmarked not later than Wednesday preceding the game—Saturday. The winner was to be selected by a professional contest manager,

Donnelley Corporation, in Chicago, on the basis of (a) and if tied, on the closest score predicted for (b), and if still tied, on (c) the best jingle. Gregory was a railway postal clerk assigned to the Atlanta-Nashville run. Through access to railway postal cancelling stamps and mail receptacles, he had, aided by his wife, devised a scheme by which the entries would bear a timely postmark and appear to have been mailed by Wednesday, but in fact would have been prepared and mailed after the games had been played. This was to cheat Crosley, other contestants, or both, all of whom assumed that the contest was competition between honest predictions, not a report on a past event.

As the contentions that the transaction could not amount to a mail fraud, but if it could, the proof was inadequate, overlap in part, it both simplifies the matter and avoids mere academic speculation to discuss at the outset the evidence by which, the Government urged and the jury agreed, flesh was put on these bones.

Evidence received in the trial covering entries submitted by Gregory and his wife comprised three games—Saturdays, September 25, November 6, and November 20, 1954. For these three contests, five entries (permitted by the rules) were submitted, one for September 25, two for November 6 mailed in separate envelopes, and two for November 20 sent in one envelope. The *time* of mailing was in dispute, but by admissions of Gregory made to a Postal Inspector, testimony of his wife and uncontradicted competent testimony that these entries were written on Gregory's typewriter, the fact that these entries were submitted and mailed for or by Gregory was overwhelmingly established. In any case, he could not question the September 25 entry since this was declared the winner for which the Gregorys received the new black Cadillac sedan.

It is here that circumstances begin to pile up. For ready reference and to indicate their cumulative total, we number in parenthesis many of the more striking ones. We begin first with the fact (1)

that the entry of September 25 arrived late in Chicago. Most entries arrived on the Friday preceding or the Monday succeeding the game—Saturday. All those arriving thereafter or bearing two postmarks were opened by the contest manager (who testified) and the envelopes were retained and clipped to the entry. The jury was authorized on the contest manager's testimony to find that this entry had arrived late and because of this and its double postmark, he retained the envelope which was admitted as an exhibit. Moreover, (2) this envelope bore two postmarks, one September 22 (Wednesday), timely, and one of September 23 (Thursday) too late.

But more important, (3) each of the postmarks was "Nash & Atl Tr 94" with the respective dates, showing that the piece had been cancelled on the very run on which Gregory served, although he lived in Tucker, Georgia, a small suburban community east of Atlanta. Also (4) Gregory had access to the railway postal cancelling stamps since the foreman customarily put the box with stamp and removable dies for month, year and date in a locker to which all clerks on the car would have a key. Mechanically it was a relatively simple thing to change dates in the stamp. But (5) the envelope could not have been handled by Gregory on the car on either September 22 or 23 because he was not on either run. However, (6) it was uncontradicted that he did work on the run on Sunday, September 26, the day after game—Saturday at which time (7) he had access to mail being processed for Illinois delivery. While it was shown that a railway mail car has a mailing slot for public use while in or at a terminal, there was (8) no proof whatsoever from either Mrs. Gregory or her son, who testified extensively concerning the various places and times of mailing, that any of the three of them had ever made a direct deposit into the mail car on Train 94 on either September 22 or 23, or at any other time, or that the train as then made up for those days made this mail slot available in fact. Since, had it been deposited in any fixed mailbox in the Atlan-

ta area or in the post office (or annex) of Atlanta, or any of these suburban communities, it would, in the regular course of affairs, (9) have borne the postmark of such post office, and (10) it would not have borne the railway postal cancellation even though the piece of mail happened to be transported on Train 94.

In addition, (11) this envelope bore a stamp "Missent to Atlanta Ga." But (12) this stamp varied from all missent stamps used in the Atlanta Post Office as reflected by testimony and as shown by actual impressions made in the spring of 1955. This stamp was in two lines and contained no punctuation. The regular official stamps were one line and punctuated. And this stamp impression was made by an "office kit" by which separate rubber characters are placed in a grooved metal holder rather than a manufactured, rubber cast stamp. Further, (13) a letter missent to Atlanta would bear an Atlanta postmark as the normal result of forwarding to the proper destination.

The entry itself was unusual. It (14) predicted the winner of 19 out of 20 of the specified games. And (15) the one error was in a West Coast game which testimony showed was not listed in the Sunday Atlanta papers of the succeeding day. Even more peculiar was the "Gridiron Special" which correctly listed the score: Duke 52—Pennsylvania 0. The (16) explanation for this was itself curious. Out of loyalty to the South, they picked Duke, and since Gregory had not seen Duke since 1952 and knew *nothing* about Pennsylvania, they thought it a good hunch to select 52-0. But (17) actually this was further weakened by Gregory's insistence that from study and research he had become an "expert" prognosticator, but (18) almost in the same breath (in oral statements to the Inspector), he placed teams in the wrong conference and generally indicated no unique familiarity with collegiate football.

The circumstances multiplied in the second weekly contest for the game—Saturday November 6. There were two entries (Counts two and three) and (19) both were mailed in window-type enve-

lopes which would permit mailing to a sender and reuse of the envelope showing the prior postmark. Both (20) of the envelopes bore a November 2, 1954, Atlanta, Georgia postmark. November 2 was a Tuesday and a day ahead of the deadline. Although Gregory and his family resided at 4600 La Vista Road in Tucker, Georgia, (21) one entry was in the name and address of "Tolstoi Gregory, 142—7th Avenue, North, Nashville, Tennessee," with the envelope showing a return address "Gregory, 39—15th Street, Atlanta, Georgia." The other entry (22) used the same name and Nashville address on the entry but showed "T. Gregory" and the Nashville address as the return address on the envelope. The Nashville address was the hotel at which he made his overnight stops and the Atlanta address was that of a relative.

Here, again, miraculous prescience was shown, for (23) in one of these two entries, all 20 games were correctly picked, in the other there was but one error, and both had the precise score for the "Gridiron Special." In addition (24) scientific tests and photographs indicated to Government expert witnesses that both envelopes had been sealed lightly at one time, the seal carefully broken and resealed tightly. Again (25), like the first entry, Gregory had access to Illinois mail as he was on the Train 94 run of Sunday, November 7.

These circumstances continued in the last entries for game—Saturday November 20 (Count four). For (26) both entries were perfect with all 20 games correctly picked, and the score for the "Gridiron Special" exactly right. Here (27) the postmark, dated November 17, 1954, on the single envelope containing the two entries was "Nashville Tenn TO Union Station." This office was connected with and under the jurisdiction of the Railway Postal Service and was located in the railroad facilities at Nashville. Gregory (28) made the run of November 17. There was, however, no showing that he did or did not make the run on the next Sunday, November 21.

Remarkably significant, (29) all four entries for game—Saturdays November 6 and November 20 (sent in the three envelopes described) arrived late. They were physically opened by the contest manager who testified. The envelopes were retained, stapled to the entry blanks and are in the record as exhibits. And, finally, (30) the explanation offered by Mrs. Gregory that variations of names and addresses were used to enable them to identify which jingle won in the event of a tie did not stand up. For she had to acknowledge as to the last contest that two entries were sent in one envelope.

With great ingenuity and resourcefulness, the aggressive and able counsel for Gregory attacked these circumstances with some of their own. These were primarily aimed at demonstrating that sufficient positiveness could not be attributed to some of these facts upon which to base the inferences asserted when they concerned how or in what manner mail would ordinarily be handled in the regular course of affairs by the Postal System. For example, to offset the proof that an "official" missent stamp was a one-line, not a two-line, device, they obtained and introduced the actual two-line stamp from the nearby Tate, Georgia, Post Office. To compensate for the absence of an Atlanta postmark on the piece (September 22–23) marked "Missent to Atlanta," they had several pieces which had been resent without the added postmark of the forwarding station. A few samples showed no postmark and one showed a delivery a month *prior* to the mailing postmark. And without the elaborate paraphernalia of a crime laboratory, they found, and identified in the record, new unused envelopes in the stationery supply of their law office which had been lightly sealed with slight "bubble" marks being left similar to those on the window envelope exhibits.

We come then to the two basic contentions. Was this transaction one within the mail fraud statute? Was there proof beyond a reasonable doubt that Gregory confected such a scheme and then made *a* use of the mails in its furtherance?

On the first of these Gregory argues that since Crosley not only intended, but was anxious, to give away a black Cadillac sedan, nothing he did caused it to part with its property. Conversely, so far as other contestants were concerned, until the bird was in the hand, the Cadillac did not belong to them either singularly or in a group. Consequently, nothing he did caused them to part with that which was, or was soon to become, their property. And, bypassing these difficulties, he asserts further that the rules of the contest were such that when the thousands of entries and their geometric probabilities are taken into account, Donnelley Corporation, as the sole and final contest judge, had so much left to its unfettered judgment in determining the possible ties on (a) or (b), and even more so, in the appraisal of (c) the jingle rhyming line, that neither contestants nor Crosley could say that anyone could lose any right, potential or actual, to this prize. In other words, since the contest judge alone could determine the winner, no one could establish that because of Gregory's fraud (assumed) such other person had lost out.

But this and a literal reliance on some of our words in Etheredge v. United States, 5 Cir., 186 F. 434, 441, reflects a basic misapprehension of the mail fraud statute. The thing sent through the mails need not, as impliedly urged, be a cunning deceptive appeal which causes another to give up money or property. It can be, and frequently is, a thing wholly innocent or innocuous in itself, such as the deposit of a check, transmission of a check from a collecting to a drawee bank, or the like. The thing which is condemned is (1) the forming of the scheme to defraud, however and in whatever form it may take, *and* (2) *a* use of the mails in its furtherance. If that is satisfied, more is not required. "The scheme exists although no misrepresentation of fact is made. Success of the scheme is not essential to completion of the offense and it is not necessary to prove communication of the alleged false representation to the victims." Kreuter v. United

States, 5 Cir., 218 F.2d 532, 535. Hermansen v. United States, 5 Cir., 230 F.2d 173; Henderson v. United States, 6 Cir., 202 F.2d 400, 404; Shushan v. United States, 5 Cir., 117 F.2d 110, 115, 133 A. L.R. 1040; United States v. Sylvanus, 7 Cir., 192 F.2d 96, 106.

The aspect of the scheme to "defraud" is measured by nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society. Crosley was entitled to determine on what basis, for what reason, and under what circumstances it wanted to give away its black Cadillac sedan. The terms generally were that all contestants would make and mail an honest guess not later than Wednesday. All were competing on that assumption. Gregory, on the jury verdict, found a way to gain an advantage. He pretended that his prediction was likewise made and mailed by Wednesday. What it was in fact was a report of known events—the scores and winners of games already played. This was to cheat and deceive, to pretend and misrepresent. As such, it was to defraud, for as Judge Holmes so colorfully put it "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity," Weiss v. United States, 5 Cir., 122 F.2d 675, 681, certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. And see Abbott v. United States, 5 Cir., 239 F.2d 310, 314.

Moreover, this case is a unique one as contemporary mail fraud cases go. Normally the use of the mails is an incident, frequently unintended, to what is otherwise a local scheme of state cognizance. Despite this, the Act applies since it is "immaterial whether the probable, likely use of the mails was contemplated either at the outset or during the performance of the scheme. Morris v. United States, 5 Cir., 112 F.2d 522, certiorari denied 311 U.S. 653, 61 S.Ct. 41, 85 L.Ed. 418. The statute forbids the *use* of the mails as the means of consummating frauds, and if the mail is used in its actual exe-

cution, it matters not whether it was intended or anticipated." Abbott v. United States, supra.

Here, however, the use of the mails was an ingredient of the scheme. The contest rules required a mailing and a mail postmark. Not only that, this scheme could not work without the use of the mails and the unique opportunity Gregory had to put these entries in the stream of mail to give them an appearance which belied the truth. If there ever were a case in which there is a genuine national interest in preserving the purity of the mails, and more so, the fidelity of its trusted postal employees, this is it.

■ On the evidence we think that that which we have briefly summarized was more than adequate to authorize the inference that this scheme was set up to defraud. At the same time, these strands in this complex web of circumstance were too many and too strong to require a conclusion that all were innocent so that the inference of non-guilt was equally reasonable. Guevara v. United States, 5 Cir., 242 F.2d 745; Rodriguez v. United States, 5 Cir., 232 F.2d 819, 821. Of course, the element of the use of the mails by or for Gregory was established almost without contradiction. Even though the scheme to defraud was established so that it would not ordinarily be necessary to show a specific use of the mails which would make the scheme effective, Kreuter v. United States, supra, we may assume that for this unique case it was essential to prove that there was a specific surreptitious post-event mailing with predated cancellation. For this too was established with requisite sufficiency.

■ With this falls as well the procedural complaint covering the Court's refusal to give the requested instruction on circumstantial evidence. Actually, one was given in traditional terms, but even this was not required. "The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must

be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decision * * * but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect. * * * [That is so because] circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy of ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166.

■ There was no abuse of the Court's inherent discretion in declining, under a subpoena duces tecum served on the United States Attorney, the requested production of all missent stamps of all post offices all over the United States. The question related to Atlanta, Georgia, and all of those stamps still in existence were produced.

■■ Nor was there error in the rulings on evidence. The first was the Postal Inspector's testimony in which he stated that he put certain questions to Gregory who gave no satisfactory explanation. This was admitted without objection. On the completion of the witness' testimony, Gregory moved to strike it for the first time. The Court declined at the moment reserving it for instructions to the jury. The jury was categorically instructed not to consider it. The Court thus did everything which Gregory sought. It was in no sense similar to Helton v. United States, 5 Cir., 221

F.2d 338. The second related to proffered testimony from a relative in connection with other testimony given by her that she had submitted many entries in this contest, and that one week, using information which Gregory furnished her, she was able to pick 19 out of 20 winners. She was permitted to testify in detail as to the system and materials used by Gregory in making his selection and this included the manner in which he got the 52–0 "Gridiron Special" score correct. She could and did testify freely on what she did, what Gregory did, and how, if at all, what Gregory did, helped her. Gregory was not, however, permitted through her mouth to state, and thus avoid cross examination, how and in what manner he arrived at these phenomenal predictions in the five entries.

And last, it was not error to refuse Requested Charges 6 or 7, or variations of them, stating that in connection with the entries the word "address" did not necessarily mean place of residence but denotes the place where mail or other communications may reach a person, or where he may be communicated with, or found; and that the mere fact that Gregory may have used variations of his name in submitting such entries was not of itself fraudulent as a contract or obligation may be entered into by a person under any name he may choose to assume so long as he does not assume a name for the purpose of defrauding other persons through a mistake of identity. The use of these variations in the names and the three addresses was a relevant circumstance from which, with others, the jury could infer that this was a scheme to defraud. If their use was a part of and to further this deceptive and dishonest scheme the jury was entitled to consider it. The instructions, derived primarily from substantive law concerning bills and notes and commercial contracts, were too narrow. If the instructions kept the jury from considering these in context as a part of a stealthy plan, they were erroneous and misleading; if they meant to allow the jury to draw the inference of fraudulent purpose, this was already ade-

quately covered in the Court's general charge.

We have considered all other matters and find none of them substantial.

Affirmed.