**UNITED STATES of America,**
**Appellee,**

v.

**Arthur FROMEN, Defendant-Appellant.**

**No. 211, Docket 25285.**

United States Court of Appeals
Second Circuit.

Argued Feb. 2, 1959.

Decided April 3, 1959.

Certiorari Denied June 15, 1959.

See 79 S.Ct. 1295.

Frank G. Raichle, of Raichle, Tucker & Moore, Buffalo, N. Y., for defendant-appellant.

Leo J. Fallon, Sp. Asst. to U. S. Atty., Western District of New York, Buffalo, N. Y. (John O. Henderson, U. S. Atty., and Frederick W. Danforth, Jr., Asst. U. S. Atty., W. D. N. Y., Buffalo, N. Y., on the brief), for appellee.

Before CLARK, Chief Judge, MADDEN, Judge, United States Court of Claims, * and HINCKS, Circuit Judge.

HINCKS, Circuit Judge.

The defendant was convicted upon an indictment containing four counts involving use of the mails to defraud, in violation of 18 U.S.C.A. § 1341, and four counts for aiding and abetting a bank officer in misapplying bank funds in violation of 18 U.S.C.A. §§ 656 and 2. He was given an aggregate sentence of ten years, five years on the first mail fraud count with concurrent sentences upon the other mail fraud counts; and five years on each of the misapplication counts, the sentences on the misapplication counts running concurrently with each other but consecutively to the mail fraud sentences. From the judgments of conviction, he appeals.

■ The mail fraud counts alleged, as a part of a scheme to defraud, that the defendant on October 30, 1956 opened a personal checking account under the name of "Edward DeGone" in the Liberty Bank of Buffalo, Niagara Falls Office (hereinafter called the Niagara Bank) and on November 30, 1956 opened a special checking account in his wife's name at the Manufacturers and Traders Trust Company, A. M. & A. Branch (hereinafter called the Buffalo Bank); and that thereafter between March 15, 1957 and May 13, 1957 he cashed or deposited at the Buffalo Bank checks drawn on the said Niagara account knowing at the time that there were insufficient funds in the Niagara account to pay said checks and that he was without funds to pay said checks when the same would be presented for payment.[1] These counts further alleged that by depositing in the Niagara account a sufficient portion of the proceeds thus obtained to cover similar checks previously cashed or deposited by the Buffalo Bank, the defendant "did represent to the [Buffalo Bank] that there were sufficient funds in the [Ni-

---

* Sitting by designation pursuant to the provisions of 28 U.S.C. § 291(a).

1. The foregoing allegations alone, coupled with an adequate allegation covering the statutory requirement of a mailing, sufficiently stated a violation of the mail fraud statute. United States v. Lowe, 7 Cir., 115 F.2d 596, certiorari denied 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466. On this appeal no question is raised as to the adequacy of the allegation and proof of the requisite mailings.

agara] account to meet and pay" the checks previously drawn; that such representations were false and fraudulent, the Niagara account at all times being insufficient to meet all the checks previously cashed by the Buffalo Bank, and were intended to defraud the Bank to the defendant's profit. Each count alleged a separate mailing. Each of these counts, we hold, sufficiently charged a check "kiting" scheme in violation of 18 U.S.C.A. § 1341. Federman v. United States, 7 Cir., 36 F.2d 441, certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146; Henderson v. United States, 6 Cir., 202 F.2d 400; Deschenes v. United States, 10 Cir., 224 F.2d 688; United States v. Feldman, 2 Cir., 136 F.2d 394; United States v. Lowe, supra.

■ The defendant's contention that there was insufficient evidence to sustain the verdicts on the mail fraud counts, is without merit. There was evidence to show that when the defendant opened his account at the Buffalo Bank on November 30, 1956, through Rick, the manager of the Bank, he was personally indebted to Rick in the amount of $9,500; that shortly thereafter, in December 1956, Rick, whose authority to make unsecured loans was limited to $2,500, cashed checks drawn by him on the Niagara Bank which were returned for insufficient funds. The aggregate amount of these checks in excess of balances in the defendant's Buffalo account when the checks were returned, was about $11,-000. Rick then demanded of the defendant that he make the checks good, saying: "I can't continue to hold them indefinitely." The defendant promised to make the checks good but some two months later the Buffalo Bank held uncollected checks of the defendant to an even greater amount. Thereafter Rick advanced an aggregate of $13,000 of his personal funds to cover the defendant's uncollected checks: as he himself testified, "As checks came in and they weren't provided for I covered them myself with my own personal funds." For some, at least, of the funds so advanced Rick took notes from the defendant (payable to Rick personally) which were never paid. Against this background must be evaluated the subsequent transactions occurring between March 15 and May 13, 1957, as set forth in the mail fraud counts. As shown by undisputed evidence in abundance, the defendant repeatedly obtained from the Buffalo Bank, through Rick on Niagara checks known by Rick to be worthless, cash which he deposited in the Niagara account to cover earlier Niagara checks, for which the Buffalo Bank had given cash or credits and which Rick, in connivance with the defendant, had caused the Bank to hold as "cash items." By this scheme, new checks, also worthless, were substituted for older ones and deposits in the Niagara account of the proceeds of the new checks made it possible for the Buffalo Bank to collect the older checks in the usual course with a semblance of regularity. The effect was to conceal the earlier fraud and thus to assist the defendant again to pass off his worthless checks in ever larger amounts on the Buffalo Bank.[2] When at last through the illness of the bank's manager the fraud came to light the Buffalo Bank was left with worthless uncollected checks of the defendant in an aggregate amount of over $60,000.

■■ In this connection, the defendant stresses the alleged absence of evidence to prove that, as charged in these counts, he made false representations to the Buffalo Bank as to the state of his Niagara account. But this criticism is untenable for several reasons. The mere presentation of the Niagara checks to the Buffalo Bank for cash or credit was an implied representation to the Buffalo Bank that there were sufficient funds in the Niagara account to cover them. United States v. Lowe, supra. Although one of the Bank officers knew that the representation was false, the representa-

2. Concealment of fraud in order to perpetrate further frauds may be an integral part of the proscribed scheme. Cf. Kann v. United States, 323 U.S. 88, 96, footnote 8, 65 S.Ct. 148, 89 L.Ed. 88.

tion *to the Bank* was nonetheless false. Moreover, the allegations in the indictment of *misrepresentation* may be treated as surplusage. "A scheme or artifice to defraud" coupled with the requisite mailing, is enough to bring a case within the ban of the statute: without need for resort to misrepresentations such a scheme was alleged and proved here. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; Gregory v. United States, 5 Cir., 253 F.2d 104; Abbott v. United States, 5 Cir., 239 F.2d 310; Kreuter v. United States, 5 Cir., 218 F.2d 532; Henderson v. United States, supra.

We find even less substance to the defendant's assertion that there was insufficient evidence to support the convictions on the charges that the defendant aided and abetted a bank officer in misapplying bank funds in violation of 18 U.S.C.A. § 656. It is true, of course, that to convict the defendant of aiding and abetting the bank officer it was necessary to prove all the elements of a federal offense by the bank officer. Here Rick, the bank officer, himself testified that he carried as cash checks of the defendant long after they had been returned uncollected from the Niagara Bank on which they had been drawn and thereafter, while such checks were still unpaid repeatedly cashed further checks drawn on the defendant's Niagara account; that he requested the defendant to replace "old" unpaid checks with "new" ones; and that to conceal such transactions he made erasures and alterations on the bank records "in case we have an audit" and "to falsify the record." [3] The evidence of deliberate misapplication by the bank officer as well as participation by the defendant, with criminal intent on the part of both, was ample.

3. Rick further testified:
"Q. When you paid out the moneys of the bank against these insufficient fund checks, did you pay it out knowingly and deliberately and intentionally? A. Yes.

\* \* \* \* \*

"Q. Mr. Rick, when you cashed these last two checks on the 11th [May], did you have any conversation with the defendant at that time? A. Yes.

"Q. What did he say to you and what did you say? A. He said 'I need cash to take down to the bank to cover the previous checks that had been cashed' and that was Saturday afternoon and he said 'I want it now because I have to get down to the Liberty Bank the first thing Monday morning and I won't have time to come up and get the money. I can make it quicker by going from my home.' At that time I said to him—shall I go on?

"Q. Yes, the rest of the conversation. A. I said 'I got to the end of my lane, for the past two weeks I have been sick and can't even write.' I said 'I have been dragging my right leg. It looks as if I am getting a stroke.' He said 'Whatever you do, don't get sick on me.' I said 'I can't take this any longer, the strain and stress is more than I can bear.' He says 'What are you worrying about, you have too thin a skin. If it comes out I will take all the blame.' He says 'I have been in trouble before and I can get the best lawyers to get me out of it,' and that afternoon when I got home I was stricken with a stroke.

\* \* \* \* \*

"Q. Will you tell us about this occasion when you went to the Liberty Bank of Niagara Falls with some other person and deposited money over there? A. Yes, there was a check for $1,325.00, which I had cashed for him, and he told me that he needed cash to cover it.

"Q. To cover what? A. To cover the check coming into the Liberty Bank at Niagara Falls, so he came into my office and asked me about it, and I said 'I know that check isn't good, but I will advance you the money to cover it.' He says 'All right, but I haven't time to go down, I have to get back to my office, it is a big gambling day.' He said 'I will send a bell boy from the Hotel Buffalo with my car and you go down with him and see that he deposits it.' I went down with him and went into the parking lot of the Liberty Bank at Niagara Falls, and he went into the bank and deposited the money and brought me back to the office.

\* \* \* \* \*

"Q. Did you also primarily intend to protect yourself? A. He had me in a satchel. I was trying to get off the best I could.

\* \* \* \* \*

"Q. Now then it is your present version in May of 1957, Fromen was in-

■ The defendant predicates error on the judge's refusal to grant his requests 13, 39 and 40 which sought instructions that the mail fraud counts and the misapplication counts were so basically inconsistent that convictions on one group precluded convictions on the other group. But this contention rests only on the assumption that the defendant's scheme to obtain cash from the Buffalo Bank in return for worthless checks drawn on the Niagara Bank was not a scheme to defraud the Buffalo Bank if a Buffalo officer knowingly cooperated with the defendant in the execution of the scheme. In the context of this case, at least, the assumption is without any foundation in law. Since under the defendant's own hypothesis the Bank's officer was colluding with the defendant's fraud, the Bank was not chargeable with the officer's knowledge that the defendant's checks were worthless. Mutual Life Ins. Co. of New York v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L. Ed. 1202; American National Bank of Nashville v. Miller, 229 U.S. 517, 521, 33 S.Ct. 883, 57 L.Ed. 1310; In re United States Hair Co., 2 Cir., 239 F. 703; Justheim Petroleum Co. v. Hammond, 10 Cir., 227 F.2d 629, 633; 3 C.J.S. Agency § 270. We conclude that on the allega-

debted to you personally for money expended out of your own funds in his behalf? A. Yes.

"Q. And is it your claim that you had a right to reimbursement for those funds? A. I expected to recover some time from him.

"Q. And you had in your possession several of his checks, right? A. None of his checks. I had his notes.

"Q. You had in the physical possession of yourself, as an officer of the bank, several of his checks? A. In the bank records, yes.

"Q. Now how much of your own personal money do you claim you had advanced in behalf of Fromen? A. $13,-025.00.

"Q. Are you related to Fromen in any way? A. No.

"Q. He was a customer of the bank in '57? A. Yes.

* * * * *

"Q. Now I show you Government's Exhibits 57 through 60, do not read from them, but I ask you if that refreshes your recollection as to how much money he owed you at that time? A. $9,500.-00.

"Q. When he thereafter cashed checks with you during the month of December, he did, did he not? A. Yes.

"Q. Do you recall whether you had any conversation with him in connection with the amount of money he owed you in the cashing of further checks? A. Yes.

"Q. And when abouts was that? A. I told him he was bleeding me white—

"Q. When was that, in December? A. I can't pin-point the time.

"Q. Was it in that month? A. I think it was.

"Q. Whereabouts did it take place? A. In my office.

"Q. What was that conversation? A. That I had gone as far as I could up to that point, and he would have to bail me out, and he said well, if I went along with him on this check business he would see I got all my money back.

"Q. You mean in connection with cashing more checks for him in December? A. Yes.

"Q. So you then cashed them? A. I kept on in the hopes I would get mine.

"Q. Subsequently some of these checks came back, is that correct? A. Yes.

* * * * *

"Q. Now there came a time when Fromen came in there one day and said he wanted to borrow a few thousand dollars for the day and you gave him some money, and he paid it back before the day was over? A. He didn't borrow any money but gave a me a check and said would take care of it that same day.

"Q. And he did it, didn't he? A. On occasion.

"Q. Whether you call it borrowing or whatever it was he got the money and returned it on the same day, right? A. That is right.

* * * * *

"Q. When Mr. Fromen came in and obtained a few thousand dollars from you for the day and brought it back at the end of the day, that was the bank's money, wasn't it? A. Yes.

"Q. And he gave you a check for it? A. Yes.

"Q. At the end of the day he redeemed the check? A. Yes.

"Q. And he got $3,000.00 on the faith and credit of the check and his general credit standing with you, isn't that right? A. I wouldn't say his general credit standing with me.

"Q. It was on the faith and credit of the check, then? A. On the check, yes."

tions and proofs here there was no inconsistency between the mail fraud and the misapplication counts.

■ Several claims of error stem from the judge's charge. This contained one passage in which the judge said:

"There has been an expression used from time to time that it is the burden of the Government to prove every element of the crime alleged beyond every reasonable doubt. That is not the law. It is proof beyond a reasonable doubt and not necessarily to a mathematical certainty. There is no obligation whatsoever upon the defendant to prove his innocence. The presumption of his innocence remains throughout this case unless and until you reach a verdict wherein you find the defendant guilty of the elements of the crime of any or some of the above counts beyond a reasonable doubt."

The defendant would have us lay special emphasis upon the first two sentences of this excerpt. He argues that the jury was confused by the statement, "That is not the law." But it is well settled that the charge must be considered as a whole and thus tested we think it plain that the judge meant to say only that the law does not require proof beyond *every* doubt. That such was the purport of his instruction which was conveyed to the jury is shown by the last three sentences of the above-quoted excerpt. Moreover, elsewhere in the charge the jury had been repeatedly instructed that guilt must be established beyond a reasonable doubt, and so as to each count. Indeed, the jury was even told that to convict they "must be satisfied beyond a reasonable doubt * * * as to each element of the first four counts * * *." In this, the instructions as to reasonable doubt perhaps went further than is required to protect the defendant. Cf. United States v. Pape, 2 Cir., 144 F.2d 778, certiorari denied 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602; United States v. Spagnuolo, 2 Cir., 168 F.2d 768, certiorari denied 335 U.S. 824, 69 S.Ct. 48, 93 L.Ed. 378. We conclude that the instructions as to the quantum of proof were free from prejudicial error.

■ The defendant also complains of the trial judge's refusal to give his requested charge 42.[4] In this we find no error. For there was no evidence upon which a jury could reasonably find that the defendant, who without contradiction obtained $60,000 of bank funds on his own worthless checks, was without knowledge of this misapplication of funds or that he in good faith believed that the moneys which he received as charged in the misapplication counts upon presentation of his own worthless checks were given him as an authorized bank loan. There was, therefore, no basis in the record for the requested instruction and on that account its refusal was not erroneous. United States v. Achilli, 7 Cir., 234 F.2d 797, 808, certiorari denied 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122, vacated 352 U.S. 1023, 77 S.Ct. 588, 1 L.Ed.2d 595, affirmed 353 U.S. 373, 77 S.Ct. 995, 1 L. Ed.2d 918, rehearing denied 354 U.S. 943, 77 S.Ct. 1391, 1 L.Ed.2d 1540. Moreover, the subject matter of Request 42 was adequately covered, we think, in other passages from the charge, some of which we set forth in the margin.[5]

4. Request 42 was as follows:
   "If you find that the defendant knew of no misapplication of funds by the bank officer and in good faith believed that the bank officer was extending him credit, there can be no conviction of the defendant on the counts charging misapplication of funds by the bank officer."

5. Excerpts from charge as given:
   "A mere finding of misapplication of funds of the bank by the bank officer, Rick, at or about the time of the transactions charged against the defendant is not sufficient to justify a conviction of the defendant. You must go further and find that the defendant, with criminal intent aided and abetted such misapplication before you can convict the defendant.
   *    *    *    *    *
   "If the bank officer was in good faith extending credit to the defendant, even though unbeknown to the defendant, he exceeded his authority in so doing, you

Especially in view of the quoted excerpts, other criticisms of the charge and exceptions to refusals are wholly without substance. The evidence of guilt was overwhelming. Neither in the charge nor elsewhere in the trial record do we find just cause to believe that the trial was lacking in fairness.

Affirmed.

MADDEN, Judge (dissenting).

This is not a case in which the Court is urged to set aside the conviction of an obviously guilty person because of technical errors which might have, but probably did not have, an appreciable effect upon the outcome of the trial. It

is a case in which, in my opinion, the trial resulted in the conviction of a man who was shown by the evidence not to be guilty of the crimes for which he was tried and convicted.

There is no real disagreement as to the objective facts. Mr. Rick was the manager of the Adam, Meldrum and Anderson Branch of the Manufacturers and Traders Trust Company of Buffalo. He had been an employee of the Adam, Meldrum and Anderson State Bank since 1915 and had been its president from 1943 until it, in March of 1956 became, by merger, a branch of the Trust Company. As president of the bank, before

cannot convict the defendant on any of the counts in this indictment.

\* \* \* \* \*

" \* \* \* You must also find fraudulent intent from all the evidence which you believe in this case, that the said [bank officer] intended to wilfully misapply moneys, funds and credits of the bank.

\* \* \* \* \*

" \* \* \* As to the other four counts, the aiding and abetting, the essential elements are, first, a fraudulent intent of the defendant \* \* \* to aid \* \* \* in the commission of the acts complained of.

\* \* \* \* \*

"Criminal intent on the part of the defendant is a constituent and necessary element of the charge contained in each count of this indictment, and if you have a reasonable doubt as to the existence of a criminal intent on the part of the defendant with respect to any count, you must acquit him as to such count and as to each such count.

\* \* \* \* \*

"Misapplication of funds means something more than the maladministration of the affairs of the bank. It means an actual conversion of the funds of the bank by a bank officer with intent to defraud and harm the bank.

\* \* \* \* \*

"If you have a reasonable doubt as to whether or not the bank officer, Rick, had an intention to defraud the bank, you must acquit the defendant on the counts charging a misapplication of the funds of the bank."

And subsequent to the main charge the following transpired in the hearing of the jury.

"Mr. Fallon: I would specifically request that charge 10 be read to the jury."

"The Court: Yes, I will so charge."

"If you find beyond a reasonable doubt that the defendant presented checks for payment to a bank, knowing that there were insufficient funds in his account, in the drawee bank to pay such checks, such presentment and receipt of cash or other items by the defendant amounts to false and fraudulent representations to the bank, even though certain bank officers knew that the checks were no good and cashed them, and would amount to fraud as against the bank by the defendant even though he and the officers might have hoped that this enterprise would end successfully."

"Mr. Raichle: Please note me an exception, and I invite your Honor's attention to the fact that the charge given makes no reference to the necessity of criminal intent."

"The Court: There are several requests of each party that make no reference to the entire case, and I say to you again, that the entire evidence is to be considered and the entire charge is to be considered. These specific requests are in and of themselves excerpts of legal decisions that counsel have asked for and in each case, either for the prosecution or defense, the entire charge is to be considered. I read these specific charges rather than have any question they were not given."

"Mr. Raichle: I ask your Honor to charge the jury that with respect to each count before there can be a finding of guilt or conviction that the jury must find criminal intent on the part of the defendant as you have defined it."

"The Court: I have so charged and I repeat the charge."

its merger, Mr. Rick had had dealings with the defendant. After the merger, the defendant in November 1956 opened an account with the branch bank, Mr. Rick personally handling the transaction.

In December of 1956 Mr. Rick cashed a number of checks drawn by the defendant on a Niagara Falls bank. The defendant informed Rick at the time Rick cashed these checks that the checks were not good, i. e., that the defendant did not have sufficient funds in the Niagara Falls bank to cover the checks. Rick was, nevertheless, willing to cash the checks and did cash them. This process was repeated many times between December of 1956 and about the middle of May 1957. Some of these checks were sent by mail from the Buffalo bank to the Niagara Falls bank. The first four counts of the indictment of the defendant involved this use of the mail in May of 1957.

These counts of the indictment charged that the defendant

> "did represent to the Manufacturers and Traders Trust Company that there were sufficient funds in the * * * (Niagara Falls) account to meet and pay the said personal checks previously drawn, whereas, in truth and in fact, said defendant then and there well knew that there were * * * insufficient funds * * * to pay said checks."

It is an uncontested fact in the case that the defendant did not make such a representation. It is likewise uncontested that, contrary to making such a representation he had done exactly the opposite, he had advised Rick that the checks were not good.

How, then, does one deal with the allegation in the indictment about the false representation? The Government says that although the defendant informed Rick, the only person in the bank with whom he had conversation, that the checks were not good, nevertheless he represented to "the bank" that the checks were good. That would be as if a bank were a disembodied entity, in which no human being was needed to determine to whom the bank should lend its money, for a day or a week or a year. If a private banker, the sole proprietor of a bank, should cash a check on another bank after being advised that it was not presently good, but would be made good at an early date, it would, of course, be impossible to draw the Government's distinction between "the bank" and the banker. The bank and the banker might lose the money, or they might gain the goodwill of an impecunious genius like Henry Ford or Thomas Edison and share the fabulous success of the person so improvidently trusted.

There are indications in the record that the defendant may have been a professional gambler. Why Rick, with forty years' experience as a banker, was willing to trust him, we do not know. That he did trust him, and therefore advanced money to him against his checks, knowing that the checks were not good, is uncontested.

It would be more nearly possible, physically and philosophically, to accept the Government's differentiation between the bank and the banker, and thus find misrepresentation in law where there is none in fact, if the human being listening to the customer, and handing out the bank's money, were acting, not in the interest of the bank, but in aid of the customer's attempt to cheat the bank. Such a case was Stevens v. United States, 8 Cir., 227 F.2d 5, in which the defendant induced the cashier of the bank, by tips amounting to $5,000, to join in the defendant's check-kiting scheme. Where the bank's employee connives with the customer to cheat the bank, he shares in the financial spoils, or is rewarded in some other way. In the instant case there is not a whisper of evidence that Rick profited to the extent of one penny, or otherwise, from these dealings which ran into tens of thousands of dollars.

The Government produced Rick as its witness. His testimony, which was uncontradicted and in every respect believable, seemed to me to be the story of a banker who, having made what turned out to be a bad loan to a person of pre-

carious and uncertain income, frequently thereafter has to make the choice as to whether to call the loan and irrevocably precipitate the bank's loss, or lend more money in the hope of keeping the borrower in business and ultimately salvaging the entire debt, with interest. Rick was not the first banker who faced that problem, nor will he be the last. Bankers have won and have lost in such experiences. If they lose too often, they can't go on being bankers. Rick's experience with the defendant included the ups and downs of such a situation. There were times when the defendant got hold of large sums of outside money and used it to reduce his debts to Rick's bank. At one time, some two months before the structure crashed on Rick's head, the defendant had reduced his obligations from $29,000 to $17,000. That, no doubt, gave Rick hope that all might turn out well.

Rick's conduct showed, and his uncontradicted testimony, vouched for by the Government, and confirmed by the circumstances that he acted, throughout his dealings with the defendant, for the bank and for no one else. In his position, the defendant as well as any other person dealing with the bank had a right to assume that he had the power to make unsecured loans, permit overdrafts, or give credit by cashing checks on other banks which were not immediately good. If his doing any of these things was in excess of his authority from his principal, the Trust Company, that is no reason why his customer should be sent to the penitentiary. If his doing so violated some law of the State or the Federal Government, which is not asserted by the Government in this case he, not the customer is answerable for that. If, in order to deceive the auditors and keep alive his hope of collecting this debt, he falsified the bank's records, he, not the customer, is answerable for that.

There is not a breath of evidence in this case that the defendant did not intend to pay back the money that was advanced to him. The evidence shows that in many cases he received money from Rick, the advance being made against the defendant's check, and paid it back the same day, as he had promised. It shows that when he got his hands on outside money, he used it to reduce his debt to Rick's bank. The evidence is completely consistent with the conclusion that he was, like many optimistic borrowers, hopeful that he could take borrowed money and make money with it. His occasional successes fortified his hope. At the crucial time he could not pay his debt. That may have proved that he was reckless and foolish, but one is not sent to the penitentiary for recklessly and foolishly incurring more debts than he can pay.

The Government is sensitive about the use of the word debt in connection with the defendant's actions, no doubt because the word has no criminal implications. But what, may one ask, is it if not a debt, when one receives money in return for a post-dated check, or for a presently dated check which the one who advances the money is told is not presently good. If not a debt, what is it? Is it a larceny, or an obtaining by false pretense, though there is no false pretense?

The District Judge gave the following instruction to the jury, somewhere about the middle of a long series of instructions:

"If you find that the defendant did not intend to deceive the Manufacturers and Traders Trust Company to whom the checks specified in the mail fraud counts of the indictment were presented for cashing, you must acquit the defendant on such mail fraud counts.

"The mere fact that the defendant cashed checks at the Manufacturers and Traders Trust Company which would constitute overdrafts on his account at the Niagara Falls Branch of the Liberty Bank is not sufficient to justify a conviction on any count of the indictment."

After the Court had completed its long charge to the jury, Government counsel specifically requested that his charge 10

be read to the jury and the Court read it, as follows:

"If you find beyond a reasonable doubt that the defendant presented checks for payment to a bank, knowing that there were insufficient funds in his account, in the drawee bank to pay such checks, such presentment and receipt of cash or other items by the defendant amounts to false and fraudulent representations to the bank, even though certain bank officers knew that the checks were no good and cashed them, and would amount to fraud as against the bank by the defendant even though he and the officers might have hoped that this enterprise would end successfully."

This instruction, which was adequately excepted to by the defendant, calls for several comments.

1. It is undoubtedly wrong. It simply cannot be true that such a transaction engaged in innocently and in good faith could lay a basis for a criminal prosecution.

2. This instruction, given at the most impressive time in the course of the Court's instructions to the jury, flatly and completely contradicted the Court's earlier instruction, quoted first above, which earlier instruction was unquestionably right. If the giving of instructions by the Court to the jury is anything more than a futile and insignificant solemnity, it surely cannot be tolerated that the Court, impressively and just before the case is given to the jury, erroneously instruct the jury as to the most decisive question in the case, and that the error be treated as cured by thumbing back through the pages of a long series of charges and finding one that is right.

3. The instruction last quoted above was a charge to the jury to find the defendant guilty on the four mail fraud counts. It fitted the uncontested facts of the case with exactness. The defendant had presented these checks knowing they were not good, the principal officer of the bank knew they were not good, and the defendant's position was that he and the bank's officers hoped that the enterprise would turn out successfully.

When the defendant's counsel excepted to the charge quoted above because, he said, it should have included a statement that "the jury must find criminal intent on the part of the defendant as you have defined it," the Court said, laconically, "I have so charged and I repeat the charge." This incorporation by reference of what had been said somewhere else in the Court's long charge to the jury could not have, in effect, withdrawn the specific instruction which he had just given that the mere physical acts which had admittedly been done were, *per se* criminal.

The four counts, fifth through ninth, on which the defendant was convicted, and on which conviction the second five years of his ten year sentence was based, charged the defendant with aiding and abetting the misapplication of funds by a bank officer. It is conceded that, for the defendant to be guilty of this criminal offense of aiding and abetting, Rick must have been proven guilty of the criminal misapplication of the funds of the bank.

No real effort was made to prove that Rick was guilty of a criminal misapplication of the funds of the bank. He was presented as a witness for the Government; he was questioned at length about the physical acts done by him and by the defendant. He was not asked by the Government about the purposes which caused him to do what he did. It was not intimated, in his examination or otherwise in the evidence, that he profited financially or otherwise in the transactions recited. On cross-examination he repeatedly and categorically affirmed that all of his actions were done in the interests of the bank, as he saw those interests. No evidence was introduced by the Government to contradict this testimony of its own witness. Yet the defendant stands sentenced to five years in the penitentiary for aiding and abetting the criminal acts of one as to whom there

is no proof of criminal acts. In effect the Government says that the criminality of Rick's acts was so obvious that it needed no proof; that its placing Rick on the stand and vouching for his integrity as a witness cannot bind it to the non-existence of a state of facts palpably and undeniably existent. But this palpable and undeniable state of facts would have to be Rick's criminal intention to defraud his bank.

Let us examine into this necessary criminal intention of Rick, without which the defendant's conviction could not stand, which criminal intention is supposed to be so obvious that it stands on its own feet, though contradicted by the testimony of the Government's own witness. Rick had been honorably engaged in the banking business for 40 years. He had been president of the very bank in question for 12 years. When his bank was absorbed by the Trust Company, he was made its manager, its highest executive officer. He was, on account of his age, nearing the end of a long and honorable career, with no breath of suspicion of his integrity. He then, the Government tells us, formed an intention to cheat his bank, though he knew that he was endangering his most prized reward for a lifetime of banking, his unspotted reputation for integrity; though he knew that he was exposing himself to the probability of spending his declining years, not in well earned retirement, but in a State or Federal Penitentiary. And he is supposed to have formed this intention to destroy his reputation and imperil his freedom, for what? *For nothing*. Absolutely and literally, *for nothing at all*.

In the early stages of Rick's dealings with the defendant, Rick advanced his own personal funds to the bank to cover the defendant's checks. Those advances added up to some $13,000. Yet in all of his later financial dealings with the defendant, including the repayment by the defendant of many thousands of dollars, Rick never repaid himself a penny of these personal advances.

Rick was not prosecuted for the supposed crime to which the defendant was convicted of being an accessory. The prosecuting attorney has discretion as to whom he will prosecute. In the instant case there was, in addition to and above all other reasons, the best of all possible reasons for not prosecuting Rick, i. e., that it was unthinkable that he could have been convicted.

This case was, at best, a difficult one for a jury to analyze intelligently. It involved concepts difficult of apprehension even by a subtle mind. Misrepresentation to the bank accompanied by full and truthful disclosure to the banker; aiding and abetting the commission of a crime which the evidence, common sense and human experience show was not committed; these are concepts which, if within the grasp of anyone, are not within the collective grasp of a lay jury without careful guidance. I think that the verbose, confused and contradictory charge of the Court was of no assistance to the jury. I think the conviction of the defendant was a gross miscarriage of justice.

I would reverse.