## UNITED STATES v. CITRIN.

District Court, S. D. New York.

Feb. 7, 1945.

John F. X. McGohey, U. S. Atty., of New York City (Harold J. McAuley, Asst. U. S. Atty., of New York City, of counsel), for the Government.

Jesse Perlmutter, of New York City, for defendant.

HARRY E. WATKINS, District Judge.

The indictment in this case charges Sam Elkin, Wilfred E. Cohen and Philip Citrin with use of the mails for the purpose of executing a scheme to defraud, in violation of Section 215 of the Criminal Code, 18 U.S. C.A.§ 338. Elkin was tried on another mail fraud indictment, was convicted, but committed suicide before sentence was pronounced. Cohen has pleaded guilty to this indictment, leaving only Citrin for trial. At Citrin's request, and by stipulation of all parties in writing, the case was tried by the court in lieu of a jury.

The scheme alleged in the indictment was that Citrin would open a checking account at the First National Bank of Inwood, Long Island, and that Citrin would later open a second account under the fictitious name of Harry Dresden, and that Citrin, Elkin and later Cohen would defraud J. L. Stulsaft and others by manipulating a check kiting scheme with these bank accounts whereby worthless checks for large sums of money would be given with a representation that there were sufficient funds in the account to meet and pay such checks, whereas actually there was no such money; that it took about three days for such worthless checks, negotiated in Manhattan, New York, to clear through the Federal Reserve Bank and reach the Inwood bank for payment, during which interim of three days another similar worthless check in an increasing amount would be cashed and the money deposited to cover the previously issued worthless check; and

that it was the plan and purpose of the defendants by this continuing scheme of kiting to ultimately defraud Stulsaft and others who received such worthless checks and to convert and appropriate their money to the use of defendants.

The indictment further alleges Elkin would falsely represent to such victims that he desired to obtain funds for certain persons in the paint business who wished to borrow money and would pay large bonuses for cash loans for short periods; that these borrowers, who were actually fictitious accounts, preferred to receive cash and to repay in cash; that Citrin was his assistant and made the collections, and that he, Elkin, was using the account of Citrin in the Inwood bank for the purpose of making repayments to those who loaned money to these borrowers; that worthless checks of Citrin would then be given upon the false representation that such checks were repayments of principal and interest by such fictitious borrowers.

Citrin admits that the evidence clearly shows that his friend, Elkin, had devised a scheme to defraud, exactly as charged in the indictment, and that such scheme was so cleverly manipulated that it fooled everyone. His defense is that he, too, was a victim of Elkin, believing Elkin to be a great financial wizard, and thoroughly honest, and that he, Citrin, had no intent to defraud anyone and no guilty knowledge of Elkin's scheme to defraud.

The evidence shows that the scheme included representations to victims that great profits could be made by advancing money for short term loans to various clients of Elkin. There were about ten such fictitious accounts presented to Stulsaft, a personal acquaintance of Elkin, and about the same number to Lecturn Service Company, a financing company, whose officers were persuaded by Elkin to invest money in the financing business.

From June, 1942, until May, 1943, the victims advanced money to Elkin payable to the order of dummy third parties, believing the money was being loaned to real parties. These loans were made in slowly but ever increasing amounts. Accompanied by Citrin, Elkin would frequently make part payment or full payment of principal and interest to the victims on alleged prior loans in the form of checks to the order of the victims signed by Citrin on the Inwood account. In this manner the deception

continued through the medium of Citrin and Dresden checks in alleged repayment of these fictitious loans until finally in May, 1943, the scheme exploded and each victim was caught with many worthless checks and left to suffer the loss. At that time Stulsaft held approximately $28,700 in worthless Citrin checks and Lecturn Service Company was left with an open balance of approximately $41,000 on the fictitious accounts which by that time were all merged under the name of Citrin.

While this scheme was in progress the defendant Cohen was engaged in another separate scheme with Elkin involving the forging and sending through the mails of letters purporting to come from the Treasury Department showing that large sums of money were owing to a corporation owned by Cohen. Also Cohen was engaged in a separate check kiting scheme of his own. By December of 1942, it became advantageous to both Cohen and Elkin to exchange worthless checks. And thus Cohen used many worthless Citrin and Dresden checks for his own kiting purposes and Elkin used the proceeds of many worthless Cohen checks to deposit in the Citrin account at Inwood, thereby joining the fraudulent scheme alleged in this indictment, to which he has pleaded guilty.

Neither Elkin, Cohen, nor Citrin had any money of their own in any of these bank accounts. By this continuing manipulation about one and one-half million dollars in checks cleared through the Citrin account in the Inwood bank in less than one year, although the average daily balance in this account (calculated on the days the account was active) was less than $400. The average daily clearance of checks, calculated in the same manner, was about $4,000. Citrin does not deny that he signed all these checks, but says that he did so at the request of Elkin, in whom he had the utmost confidence, not knowing of any scheme to defraud. The further sum of $175,000 cleared through the Dresden account in the same bank, although the average daily balance in that account on the days the account was active was only about $200. The mails were used daily in the execution of the scheme because the Inwood bank is a suburban bank which cleared its checks through the Federal Reserve System by mail. Every single false and fraudulent check issued by Citrin and Elkin to Stulsaft and Lecturn, after deposit by the latter in their own banks in New York, cleared to the home bank by mail.

Stulsaft was a typical victim. He was a successful business man engaged in the plumbing supply business with a daily checking account of about $15,000. He had never before loaned money for a fee. He was recommended to Elkin by an official of his own bank. Elkin had carefully laid the foundation for his fraud by promptly paying to Stulsaft an obligation of a friend upon which he was only orally liable. Elkin explained that if he had some money which was not in use, he could make some quick money. Stulsaft gave Elkin a check for $2200, the proceeds to be loaned to an unknown client of Elkin. One day later the principal was returned to Stulsaft with a profit of $33.31. One week later Stulsaft made another loan of $2900, and at the request of Elkin, made the check payable to Philip Citrin, who was represented to be a customer and a very good account. Thereafter many more checks were issued to Citrin in slowly increasing amounts, and purported repayment was made by Citrin checks on the Inwood bank. All the while Stulsaft thought he was making large profits, whereas, in fact, his ever increasing loans were being repaid with his own money. Frequently he would be asked to hold a Citrin check for a specified time until Elkin could get more money from him, which would be deposited by Citrin to meet the prior check. Sometimes checks were made by Stulsaft to fictitious persons, the checks cashed and the proceeds deposited by Citrin in his Inwood account. Elkin introduced Citrin to Stulsaft and explained that Citrin had consented to permit his account to be used for income tax evasion purposes; and that the true names of many of the persons to whom Stulsaft was loaning money would not appear on the books. Citrin came to Stulsaft's office on many occasions to pick up these checks which he would deposit in the Inwood account. Stulsaft finally found himself holding $28,700 in protested Citrin checks. He then pleaded with Citrin to tell him the truth about what had been going on, only to have Citrin assure him that Elkin was an honest man and everything would be all right.

The evidence is clear that Citrin signed and authorized Elkin to issue checks to Stulsaft and others, knowing at the time that there was insufficient money in the account to pay such checks. Citrin signed

many checks in blank and turned them over to Elkin to issue as he pleased. Each day Citrin would call up the Inwood bank to find out how much money was needed to meet checks arriving at the bank on that day for payment, whereupon checks of Stulsaft or others who were similarly defrauded, or worthless Citrin checks, would be cashed by Elkin or Citrin, and the money taken by Citrin to the bank for deposit. Sometimes Citrin carried as much as $40,-000 in cash for deposit in a single day to meet incoming worthless checks. The bank became suspicious of his account and asked Citrin to explain. Citrin told the cashier that he was doing a large paint contracting business at Manhattan Beach and in Connecticut, and because his customers were slow in paying him, he had issued checks without always having the money in the bank, a statement which was wholly false. Likewise, it was Citrin who opened up the fictitious Dresden account in the same bank, explaining that Dresden was one of his relatives. His only explanation of these false statements is that he was following instructions from Elkin in whom he placed great confidence. It appears that Elkin and Citrin had at one time been in the paint business together, and had fallen out because of dishonesty on the part of Elkin; that later Elkin served two and one-half years in the penitentiary for defrauding a finance company out of a large sum of money and was released from prison as late as January, 1941. Citrin filed a wholly fictitious income tax return covering the alleged profits from the fictitious loans covered by this indictment. He says that the return was made up by Elkin, and while he knew it was false that he signed it because he was told to do so.

It is quite clear that without such an associate such as Citrin, Elkin would not have been able to fool so many people so easily. Victims were told by Elkin in Citrin's presence that there were such borrowers and that Citrin helped Elkin bring the loans to them and that Citrin collected repayments from them. One witness stated that Citrin told him some of these fictitious customers were Citrin's personal customers and that for various reasons their complete identity could not be revealed. This same witness testified that he made out checks to such alleged parties and gave some of these checks to Citrin for delivery. Citrin was with Elkin many times when Elkin cashed Stulsaft and Lecturn checks with a check casher, the proceeds of which Citrin took to the Inwood bank to cover previously issued Citrin checks. Citrin must have known that Elkin and Cohen were regularly exchanging worthless checks because during January and February, 1943, almost daily Citrin would meet Cohen to pick up cash from Cohen which Cohen had to have put in the Citrin account at Inwood to meet previously issued worthless checks which Cohen was using to suit his convenience. At one time Citrin signed and delivered a whole book of checks on his Inwood account to be used by Cohen. Citrin must have known that the cash which Elkin obtained from Stulsaft and Lecturn was not going to any customers. The evidence shows that from June to August, 1942, about $42,000 of Stulsaft checks were deposited in the Lecturn account to cover repayments on alleged loans of fictitious customers.

While this scheme was going on, from time to time some of the victims would become suspicious of the fictitious accounts and ask for an explanation. In the presence of Citrin, Elkin would represent that the customers were known to Citrin, who made collections from them, and Citrin would either remain quiet or assure them that they need not worry. Despite all this, Citrin did as he was instructed, and never asked any questions. It is reasonable to believe that one who was himself innocent of any wrong doing, would have protested when asked to sign and file a false income tax return, or make false statements at the bank concerning the Citrin account, or to open a fictitious account in the name of Harry Dresden.

It is clear from the evidence that Elkin was the master mind and author of the scheme and told Citrin what he was to do. But it is equally clear that Citrin asked no questions because he knew that Elkin was engaged in an unlawful scheme to defraud by the manipulation of extensive check kiting, and that he was willing to participate therein. He knew Elkin's past reputation, knew Elkin did not have much, if any, money of his own; and that there was no real money in either the Dresden or Citrin account. He also knew that there was no reasonable expectation of eventual payment of his checks which were arriving at the bank almost daily in increasing amounts, except by cashing other worthless checks, and that sooner or later someone was going to suffer a heavy loss.

Elkin was a very shrewd man, with domineering personality. He was so thoroughly schooled in finance and accounting and so convincing that he made victims of lawyers, bankers and experienced business men alike. On the contrary, Citrin is an uneducated man, slow in his thinking, and one who would be easily influenced. This would explain why Citrin became a partner in the scheme but would be no defense to his willful participation in the unlawful scheme, the general character of which he knew, the details being left to Elkin. The evidence shows that Citrin was paid a salary of only $25 per week, a very trivial amount for handling so much money, and taking such an important part in the fraud. But this circumstance and his lack of education are not sufficient to overcome so many other circumstances pointing directly to his guilty knowledge. Without Citrin this fraud could not have happened. An unguarded remark by Citrin at any time would have wrecked the whole scheme. Had Citrin told the truth to the cashier of the Inwood bank when asked about his account, had he spoken up on many occasions when these borrowers whom he knew to be fictitious, were mentioned in his presence, the scheme would have failed. The only reasonable answer to all this is that Citrin was thoroughly and successfully schooled by his intimate friend and constant companion.

■ The second defense offered is that the schemes alleged in the indictment were complete before the mails were used, and the mails were not used for the purpose of executing the schemes, citing the recent case of Kann v. United States, 65 S.Ct. 148, as authority.

The use of the mails mentioned in each of the six counts of the indictment relate to the mailing of Citrin checks by the Federal Reserve Bank in New York to the Inwood bank for payment. Five of these checks were payable to Stulsaft, signed by Citrin, drawn on the Inwood bank, and received by Stulsaft as purported re-payment on what he thought were genuine loans. He deposited these checks in his bank, received credit on his bank account, and in due course the bank of deposit forwarded the checks to the Federal Reserve Bank, which sent them by mail to the Inwood bank for payment. By reason of the check kiting manipulation and not because there was any real money in the account, the checks were all honored, and of course, payment in full of the loans in question

was entered upon the Stulsaft books. It is contended by Citrin that these checks were given to Stulsaft in re-payment of money already advanced, and that the mailing was not in furtherance of the scheme to defraud. It is urged that the decisions fall into two categories; first, those in which the mails are used after attainment of the object of the scheme, and those in which the mails are used to effectuate the scheme, and that this case falls into the former group. It is said that here the sole object of the scheme was the receipt of money, and the schemes, therefore, came to an end when the money was received from Stulsaft. This argument would be sound in some cases, but it does not fit the facts of this case.

In the first place, Citrin caused these worthless checks to be issued and caused the mails to be used in their collection, knowing that there was no reasonable expectation of ultimate payment with eventual loss to Stulsaft. While he, Stulsaft, thought these loans were being repaid, the whole process was a fraud and there was, in fact, no actual repayment of money advanced. Secondly, this was not the case of an ordinary repayment of a loan obtained by fraud, but the mailing of these checks was an essential part of a check kiting scheme for fraudulent purposes. It is essential to the successful operation of such a scheme that each check be paid as presented. Here the amounts of the checks had to grow to pay interest, and such scheme to defraud is never ended until the "kite" finally combusts by its own pressure. Here the combustion did not take place until after these checks were sent through the mails. The payment of these checks helped to further continue deception. The Dresden account continued after the Citrin account was closed. During this whole period of deception the successful credit for payment of Citrin checks to Stulsaft's credit was necessary to lead him to continue relations with Elkin, Citrin and Cohen. After these checks were mailed Stulsaft received further checks which were never paid. Elkin was then able to get Stulsaft to substitute worthless Cohen notes, and thus continue the fraud. As in United States v. Feldman, 2 Cir., 136 F.2d 394, this fraud had a continuing aspect and the undertaking was such that the checks must be drawn and passed in rapid succession from one bank to another in an endless chain. In the Feldman case, there was a similar check kiting

scheme. There the worthless checks were cashed by a hotel in New York, which deposited them, and in due course they went by mail through the Federal Reserve System to the banks upon which drawn. Here worthless Citrin checks were given to Stulsaft in return for good money from him, and when he deposited them, they cleared through the Federal Reserve System by mail. Feldman got cash from the hotel for his worthless checks, whereas, Elkin and Citrin obtained more money from Stulsaft and further participation in a course of business which was built up because of Stulsaft's receipt of prior Citrin checks which had been paid. There is no essential difference in the two cases.

In the Kann case, supra [65 S.Ct. 151], the Supreme Court held that the fraudulent scheme was "completely executed as respects the transactions in question when the defendants received the money intended to be obtained by their fraud, and the subsequent banking transactions between the banks concerned were merely incidental and collateral to the scheme and not a part of it." But the court further states: "The case is to be distinguished from those where the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud, such as United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836. Also to be distinguished are cases where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated." The court then cites United States v. Lowe, 7 Cir., 115 F.2d 596, certiorari denied 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466; United States v. Riedel, 7 Cir., 126 F.2d 81, and Dunham v. United States, 5 Cir., 125 F.2d 895. In the Lowe Case the court said [115 F.2d 598]: "But the scheme of defendant, as revealed by the allegations of the indictment, was in substance a check kiting arrangement which could be successful, even temporarily, only because of the practice of the depositing bank of forwarding the check through its correspondent bank for collection from the account of the drawer in the drawee bank. The defendant included in his scheme the use of a banking practice which necessarily required the forwarding of the deposited check for collection, a practice which would enable the defendant to utilize, at least temporarily, the credit given him by the Chaseburg Bank; and the utilization of this practice was as much a part of the scheme to obtain credit as the drawing and presenting of the worthless check." Here the forwarding of the check was one in a course of events necessary to the accomplishment of the fraud, necessary in giving appearance of genuine business transactions in order that the fraud might be continued. When a person operates a check kiting scheme and issues checks which he knows that he has no prospect of paying and uses the mails in furtherance of such scheme, he has violated the mail fraud statute. Federman v. United States, 7 Cir., 36 F.2d 441, certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146; Blue v. United States, 6 Cir., 138 F.2d 351.

The judgment of the court is that the defendant is guilty of Counts 1, 2, 3, 5 and 6 of the indictment.