Clarence Orville **STEVENS**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 15278.

United States Court of Appeals
Eighth Circuit.

Nov. 22, 1955.

Henry W. Wormley, Ogden, Iowa, for appellant.

Robert J. Spayde, Asst. U. S. Atty., Des Moines, Iowa (Roy L. Stephenson, U. S. Atty., and John C. Stevens, Asst. U. S. Atty., Des Moines, Iowa, on the brief), for appellee.

Before STONE, WOODROUGH, and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Clarence Orville Stevens, the appellant, was charged with wilfully and knowingly devising a scheme to defraud the Cambridge State Bank at Cambridge, Iowa, a small town outside of Des Moines, and carrying out or putting into effect the scheme by use of the United States mails, in violation of 18 U.S.C. § 1341. The case was tried to a jury. Appellant was found guilty on all nine counts of the indictment. From such conviction he appeals to this court.

In essence, appellant was charged with operating a "check kiting" scheme which, succinctly stated, involved cashing worthless checks to procure funds for deposit to cover previous checks, there being no reasonable prospect of paying.

According to his testimony, appellant was a used car salesman and dealer in Des Moines, Iowa. In 1950 he was introduced to Harry C. Cairns, the cashier and part-owner of the Cambridge bank by E. D. Hall, a financially responsible mutual friend, and presumably a patron of appellant. Under the auspices of Hall, appellant negotiated loans from the bank and promptly repaid them, thus furthering his credit rating. The evidence discloses, insofar as Count No. 1 of the indictment is concerned, that on January 9, 1952, appellant opened a checking account with a $1,500.00 deposit at the Hartford-Carlisle Savings Bank of Carlisle, Iowa, which is also located a short distance from Des Moines. The next day he drew a check on the Carlisle account for $8,500.00, cashing it at the Cambridge bank. Five days later, before the $8,500.00 check would return to the Carlisle bank, appellant wrote out two checks, one for $9,875.00 and one for $9,750.00. He cashed these at Cambridge, received cashier's checks, and deposited enough of the proceeds at the Carlisle bank to cover the $8,500.00 check and a little more. When these two larger checks were about to reach the Carlisle bank, he was forced to cash checks totalling a still larger sum in order to cover them and provide himself with funds. These checks, in their transport between the two banks, were handled by the United States mails.

The indictment charged that it was also a part of the scheme and artifice that appellant would repeat this cycle, knowing full well that there were insufficient funds in the drawee bank to cover the checks written. Counts 2 through 9 of the indictment concern other specific checks in evidence similarly "kited". The divergence between the total of outstanding checks and the simultaneous bank balance accordingly rose from $31,413.99 at the end of February to $108,510.00 on September 30, 1952.

On October 3, 1952, the state superintendent of banking froze the account of the appellant in the Carlisle bank, subsequent to an investigation of both banks which had disclosed this loss of over $100,000.00 in the Cambridge bank. In other words, the bubble had broken, and as a result, five checks, amounting to $113,640.00, piled up on the Cambridge bank after protest by the Carlisle bank. This $113,640.00 initial loss was reduced $23,479.90 when the defendant's Carlisle bank balance was applied, and was further reduced $10,000.00 by restitution from the appellant, leaving a net loss of $80,000.00. The $80,000.00 was paid, ap-

proximately $60,000.00 by Hall, $15,000.-00 by a surety company, and $5,000.00 from sale of Cairns' stock.

Appellant argues that he was a typical used-car dealer, attending used-car auctions in larger cities, buying cars and then transporting them elsewhere for sale. From the evidence, it appears that he did nearly three million dollars worth of business in nine months; at least that is the total value of checks cashed. He avers that he had an arrangement with the Cambridge and Carlisle bankers whereby cars would be purchased by checks, taken home, sold, and the proceeds of the sales deposited to cover the checks. Supposedly it was Cairns, the Cambridge banker, who suggested this method, although Cairns vigorously denies it. At any rate, the financial gymnastics were carried on with the approval of Cairns, whose eyes were dimmed by "tips" from appellant, amounting finally to around $5,000.00.

From testimony of employees of both the Cambridge bank and the Carlisle bank, it appears that orders were in effect to give special consideration to appellant's checks. Usually this amounted to holding an "N. S. F." check in the Carlisle bank until Stevens was notified and could bring in a deposit, or delaying the checks in the Cambridge bank before sending them through for collection.

Stevens' version of these occurrences is that they constituted an "arrangement for credit" with the bankers, while the prosecution displays them as ill-advised favors. In further attempting to display the artful subterfuge practiced upon the bankers, the investigating agents testified to various efforts of the appellant to "muddy up the water" by writing checks for varying amounts and to different payees or by exchanging checks, for no apparent reason, with one V. S. Eagan.

The first contention of appellant on this appeal is that the evidence failed to show that the artifice or scheme was designed to defraud, or that anyone was defrauded.

It is claimed, as stated above, that the methods devised to secure delays in check passage were in the nature of mere "loans", that all the lenders were paid for the use of their money, and the transactions were executed in accordance with directives of the implicated bankers. Also, if the bankers were acting in an illegal or unorthodox manner, there would be no liability against the depositor unless he knew the banking rules and intended to violate them.

Appellant's argument obviously is based on the premise that he was victimized by the improprieties of the bankers. This, however, is refuted by the testimony of banker Cairns, who stated:

"I was not aware that he was conducting a check kite. I did not consider in holding his checks that I was lending him money. * * * I never suggested to Stevens that the only way I could loan him more money was by delaying the remittance of his checks."

Furthermore, concerning the automobiles which appellant told Cairns and the investigating agents he was buying in the east and selling out west, he could produce no names of dealers or purchasers involved, no bills of lading and no records. It even appeared questionable that he could have moved so fast, in view of the rapidity of his check juggling and his near-daily deposits.

It is conceded that transactions of the type evidenced by the appellant's explanation might not be violative of the mail fraud statute in the event that they were honest business transactions made unmeet by improper conduct of the banker, but the situation here indicates that the banker, not the businessman, was duped. As was stated in the case of Federman v. United States, 7 Cir., 1930, 36 F.2d 441, 442, certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146:

"This does not mean that every drawer of a check against an account where he has no funds is guilty of a scheme to defraud, but, when the undertaking is such that the checks must be drawn and passed in rapid succession from one bank to

another in an endless chain, as here, a scheme to defraud is shown."

The innocence of Stevens is further belied by his use of small banks outside Des Moines, whereby the checks took seven days to pass from one to the other, by the huge volume of checks cashed, by the increase in value of outstanding checks over bank balances from month to month, and by the various "tips" offered to those who "had been good" to him.

■ From the above, it is apparent that there was substantial evidence upon which a jury could find appellant guilty of an unlawful scheme to defraud. Also it appears that what he considers an "arrangement for credit" with the banker could be viewed as nothing more than a hoodwinked conduit making possible the operation of the scheme.

■ The second contention of the appellant is that there is no competent evidence to show that he placed in any post office any matter whatsoever to be sent or delivered by the Post Office Department. The contention is answered by a reading of the statute itself, 18 U.S.C. § 1341, as follows:

"Whoever * * * knowingly causes to be delivered by mail * * * shall be fined * * *."

It is obvious from a reading of the statute that it was not necessary that Stevens himself deposited the checks or cash letters in the mail. It is sufficient that he caused it to be done. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435:

"The elements of the offense of mail fraud under 18 U.S.C. (Supp. V) § 1341, 18 U.S.C.A. § 1341, are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548. Here, the scheme to defraud is established, and the mailing of the check by the bank, incident to an essential part of the scheme, is established. There remains only the question whether Pereira 'caused' the mailing. That question is easily answered. Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836."

■ Appellant also argues that no offense is spelled out under the statute because the scheme had its fruition before a deposit of the transmittal letters in the mail. He cites the case of United States v. McKay, D.C.E.D.Mich.S.D.1942, 45 F. Supp. 1001, in support of his contention. That case is of no help to the appellant. Therein, the indictment charged a scheme to defraud Edsel B. Ford out of $5,000.00 through making false representations. The false representations were not made through the mail. As a result of the representations, Mr. Ford paid $5,000.00. Subsequent to such payment, a cashier's check in that amount was purchased and transmitted through the mails to the appellant. That case merely held that the mailing of a check, even though connected with or related to a scheme to defraud, will not support an indictment under the mail fraud statute, if the check was not sent for the purpose of executing a fraudulent scheme. In other words, if the scheme relied on in the prosecution for violating the mail fraud statute was completed before the mail was used by the accused, the offense denounced by the statute did not exist. The situation here is entirely different. The delay caused by the anticipated use of the mails in transmitting the N.S.F. checks from one bank to another was most necessary to the success of the scheme. The contention made by the appellant herein has been made in previous cases involving kited checks and the courts have uniformly overruled it. As was pointed out in the recent case of Deschenes v. United States, 10 Cir., 1955, 224 F.2d 688, 690:

"Clearly, the appellant here knew and intended that the mails would be used in transferring the checks from one bank to the other in the regular course of business. In fact, the time consumed by such transfer was the very essence of the scheme which made it possible, and this practice constitutes a violation of the mail fraud statute. Federman v. United States, 7 Cir., 36 F.2d 441; United States v. Feldman, 2 Cir., 136 F.2d 394."

See also United States v. Scoblick, D.C. Pa.1954, 124 F.Supp. 881; United States v. Citrin, D.C.S.D.N.Y.1945, 58 F.Supp. 766.

We are accordingly of the opinion that the verdict of the jury was amply sustained by competent evidence and that the judgment should be affirmed.