**In re Edward Salvatore CLEMENTE Individually and d/b/a Ed's Coins, Debtor.**

**Charles A. SAILSTAD, Trustee, Plaintiff,**

v.

**Leon HENDRICKSON, d/b/a Silvertowne, Defendant.**

**Bankruptcy No. B75–114.**

United States Bankruptcy Court, N.D. Ohio, W.D.

Nov. 18, 1981.

Frank D. Guthrie, Toledo, Ohio, for plaintiff.

Malcolm C. Mallette, Krieg, Default, Alexander & Capehart, Indianapolis, Ind., H. Buswell Roberts, Jr., Hayward, Cooper, Straub, Walinski & Cramer, Toledo, Ohio, for defendant.

MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause came before the Court upon the Trustee's Objection to the Allowance of the Claim of Defendant Leon Hendrickson. The Objection introduces issues as to whether Hendrickson received fraudulent transfers from Clemente, and whether his claim is justly due and owing. Since the Trustee's Second Counterclaim (Trustee's Second Claim For Relief) has been withdrawn, the Court will not address the issue of voidable preferences.

An extensive trial having been held on the above issues with testimony taken, exhibits offered into evidence and post-trial briefs filed by the parties, the Court makes the following findings of fact:

## FACTS

1.) On January 28, 1975, Bankrupt Edward Clemente (hereafter Clemente) filed in this Court a Voluntary Petition in Bankruptcy.

2.) In response to Clemente's Petition, Defendant Leon Hendrickson (hereafter Hendrickson) filed a proof of claim in the amount of Two Hundred Nineteen Thousand Nine Hundred Ninety-Six and 77/100 Dollars ($219,996.77). The claim was based upon an alleged delivery of merchandise to Clemente as reflected by three invoices which were attached to his claim. The three invoices are dated July 27, 1974, in the amount of Eighty Thousand Two Hundred Forty-Seven and 45/100 Dollars ($80,-247.45); August 7, 1974, in the amount of Ninety-Three Thousand Six Hundred Twenty-Five Dollars ($93,625.00); and August 15, 1974, in the amount of Forty-Six Thousand One Hundred Twenty-Four and 32/100 Dollars ($46,124.32).

3.) Both Hendrickson and Clemente were engaged in the numismatic business which is the business of dealing in coins. The nature of this type of business is such that large amounts of money are rapidly exchanged by dealers in the purchase of gold and silver coin and bullion.

4.) Testimony at the trial indicated that Hendrickson and Clemente frequently loaned each other sums of money with which to make purchases of coin and bullion.

5.) In this particular case, Hendrickson and Clemente exchanged presigned blank checks for use by the other in the event that more money was required for any particular purchase than was immediately available in their own accounts.

6.) The Trustee asserts in his Complaint that within one year preceding the Bankrupt's filing his Petition in this Court, Bankrupt Clemente fraudulently transferred to Hendrickson approximately Three Million Four Hundred Eighteen Thousand Eight Hundred Ninety-Five and 86/100 Dollars ($3,418,895.86). The Trustee further objects to the allowance of Hendrickson's claim filed in this case upon the allegation that Clemente and he were engaged in maintaining a check-kiting scheme to defraud creditors, and therefore the monies Hendrickson claims are not justly due and owing.

## ISSUES

1.) Is the evidence of the check transfers between Clemente and Hendrickson sufficient to prove the existence of an illegal check-kiting scheme excluding any regard to proof of actual intent to defraud creditors?

2.) Are these transfers of such a nature that the Court may deem them fraudulent as not justly due and owing pursuant to the statutory guidelines of Section 67(d)(2) of the Bankruptcy Act of 1898?

## CONCLUSIONS OF LAW

The Court has closely scrutinized all of the evidence presented in light of the confines of the language found in Section 67(d)(2) of the Bankruptcy Act which is as follows:

"d.(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or

against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors."

■ Simply stated, to come within the parameters of Section 67(d)(2), a transfer must be (1) made within one year of the filing of a Bankruptcy petition; (2) there must be creditors existing at the time of the transfer; (3) the transfer must be made at a time the debtor is insolvent; and (4) the transfer must be made without fair consideration. *Inland Security Co., Inc. v. Estate of Kirshner*, 382 F.Supp. 338 (W.D. Mo.1974).

■■ In a case where a trustee in bankruptcy seeks to recover fraudulent transfers, the burden of proving such fraud is borne by the plaintiff-trustee. Fraud under Section 67(d)(2)(d) must be established by clear and convincing evidence. *Springmann v. Gary State Bank*, 124 F.2d 678 (7th Cir. 1942); *Phillips v. Wier*, 328 F.2d 368 (5th Cir. 1964). Proof is not restricted to direct and positive testimony, since fraud may be deduced from circumstances and acts which carry great probative force. If both conditions of subsections (a), (b) and (c) are present, namely insolvency or resulting insolvency and a lack of fair consideration, there is a conclusive presumption of fraud. *Cole v. Loma Plastics, Inc.*, 112 F.Supp. 138 (N.D.Tex.1953); *Keates v. Register*, 74 F.Supp. 966 (E.D.Pa.1947). On the other hand, absence of either of the specified conditions is fatal to the presumption. *Collier on Bankruptcy*, Vol. 4, Section 67.34, at 518, 14th Ed. (1979).

For purposes of this discussion, the Court will address each subsection of Section 67(d)(2) in reverse order.

I

Section 67(d)(2)(d) states the following: "d(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent...(d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors."

The Trustee asserts that the existence of the check-kiting scheme proves the fact that there was (1) an actual intent to defraud, and (2) no fair consideration involved in the transfers between Clemente and Hendrickson. This Court believes there was insufficient evidence produced by the Trustee to prove either the existence of actual intent to defraud or lack of fair consideration, through the use of a check-kiting scheme.

Check-kiting is properly defined in the case of *Federman v. United States*, 36 F.2d 441 (7th Cir. 1929), wherein the Court expressed that check-kiting was the following:

"...a plan whereby the perpetrator intended to get, and did get, money from one bank upon the representation of the check, which was a representation that there was money in the bank on which the check was drawn, when as a matter of fact there were no funds in the drawee bank, without any power in the drawer of the check to provide funds to pay such check, except by drawing a like check

under like circumstances, constituted a scheme to defraud. This does not mean that every drawer of a check against an account where he has no funds is guilty of a scheme to defraud, but, when the undertaking is such that the checks must be drawn in rapid succession from one bank to another in an endless chain, as here, a scheme to defraud is shown." at 442.

The cases cited by the trustee dealing with check-kiting all include a requirement of actual intent where the defendants knowingly kited checks to defraud creditors. *Gilbert v. First National Bank of Jackson*, 633 F.2d 686 (5th Cir. 1980); *United States v. Foshee*, 569 F.2d 401 (5th Cir. 1978); *First National Bank of Decatur v. Insurance Company of North America*, 424 F.2d 312 (7th Cir. 1970); *United States v. Gross*, 416 F.2d 1205 (8th Cir. 1969); *Conroy v. Shott*, 363 F.2d 90 (6th Cir. 1966); *United States v. Fromen*, 265 F.2d 702 (2nd Cir. 1959); *Stevens v. United States*, 227 F.2d 5 (8th Cir. 1955); *Fidelity and Casualty Company of New York v. Bank of Altenburg*, 216 F.2d 294 (8th Cir. 1954); *United States v. Broxmeyer*, 192 F.2d 230 (2nd Cir. 1951); *Federman v. United States*, 36 F.2d 441 (7th Cir. 1929). Upon examination of these cases, it appears that the majority of check-kiting cases are in a criminal setting, dealing with the criminal code. Thus, it is difficult to draw any correlations between those cases and the case at bar. For the most part, those cases are helpful only to the extent that they familiarize the reader with what check-kiting is and how to detect it. The analysis here shall be made exclusively in the context of the Bankruptcy Act, and makes no representations whether the activity involved fits the requirements of criminal code violations.

■ It is clear that if one intentionally entered such a scheme, he would necessarily be misrepresenting his financial status. However, as the *Federman* case (supra.) indicated, the mere use of uncollected funds is not of itself proof of an intent to defraud, for a reasonable expectation of repayment would in many cases tend to negative the issue of intent. *Conroy v. Shott*, 407 F.2d 1328 (6th Cir. 1968), *cert. denied*, 393 U.S. 1018, 89 S.Ct. 622, 21 L.Ed.2d 562.

The facts elicited at the trial tend to show that Clemente and Hendrickson knowingly used the "float" of the checks to their advantage (Tr. 193). A checking float occurs when someone writes a check without sufficient funds, then covers the check before it returns to the bank for payment. (See Tr. 139–147, 911–912, 939–941, 962–965, 1016–1020). The Trustee asserts that this mere use of the float negates any inference of good faith.

■ But again, as the cases indicate, the act of floating checks is not per se illegal; however, when it is viewed in the light of an intent to gain at the bank's expense, that is illegal. In fact, the banks do not need to actually lose money for an injury to be sustained. It has been stated that the risk a bank takes in relying on the representations of the customer that there were funds in his account is sufficient detriment. The risk would be the exposure to the hazard that the scheme would go awry. *United States v. Foshee*, 569 F.2d 401 (5th Cir. 1978); *United States v. Gross*, 416 F.2d 1205 (8th Cir. 1969); *Baskerville v. Maryland*, 23 Md.App. 439, 327 A.2d 918 (Ct.Spec.App. 1974).

■ The trial testimony tends to show that the banks involved knew of the use of uncollected funds, but had no knowledge or belief that this use was a kiting scheme. In the direct examination of one of the Trustee's witnesses, Russell Kramer, the bank auditor of Ohio Citizens Trust Company (Clemente's bank), the following testimony was taken (See Tr.–607):

Q. (By Mr. Guthrie, Attorney for the Trustee)—"Now, does the Ohio Citizens Trust Company have a policy regarding its customers' use of uncollected funds?

A. —The Bank allows the use of uncollected funds in the normal course of business."

Mr. Kramer proceeded to explain that the bank does not now and did not then permit

the kiting of checks. In fact, Ohio Citizens maintained a system for the detection of check-kiting. A computer would print out all the accounts where kiting was suspected (by the repeated use of uncollected funds). These lists would then be narrowed by manually checking for a kite. It was the Bank's policy to close any accounts where kiting was then actually found. Mr. Kramer agreed that this system did not absolutely guarantee detection; however, he stated that neither of Mr. Clemente's checking accounts were ever closed.

It is important to view the transactions between Clemente and Hendrickson within their common business practices in order to determine if there was evidence of kiting. The business of dealing in gold and silver coin and bullion was explained by several witnesses: Clemente, Hendrickson, Charles Varner, Tom Noe and John Engle, all dealers or former dealers in the coin and bullion market. They all indicated that the market moved very rapidly in response to the price fluctuations. In many instances funds were loaned to another dealer on trust alone and without an obligation to pay interest. This activity enabled the dealers to purchase a "good deal" which might not be available the next day or even the next hour. Consideration for these loans appears to be the opportunity of the creditor to purchase the goods before they were shown to anyone else. Further consideration was the opportunity to have the same favor returned at a critical point when the creditor himself needed extra cash for a deal.

In finding that there was not sufficient proof to show a check-kiting scheme, this Court looked to the testimony of the experts presented as well as the great volume of exhibits placed in the record in the context of the common practices of the numismatic business.

The Trustee's expert, Mr. Terwilliger, attempted to show that both Hendrickson and Clemente were using uncollected funds. This activity was admitted by Hendrickson at the trial. However, what was not sufficiently proven by Mr. Terwilliger's testimony, was the allegation that each check was

covered by means of a deposit of a *similar* check of insufficient funds as explained in *Federman* (supra.) In fact, balancing the testimony of the Trustee's expert and the testimony of the Defendant's expert, Mr. Potter, it appears that a majority of the checks between Clemente and Hendrickson were covered by collected funds. (See Tr. 641–828, 1045–1149).

A crucial aspect of Mr. Potter's testimony reveals that he made inquiries into the type of business transactions involved as well as specific business practices. Further, Mr. Potter has had experience in auditing dealers in the securities and commodities market whose transactions are similar to those described here, which are the rapid exchange of checks in a short time span used to take advantage of market prices. (Tr. 1126–1127).

Upon reviewing all the work done by Mr. Terwilliger, Mr. Potter stated that any "chains" established were always broken. Suffice it to say, each expert disagreed with the other's interpretation of the records of the Bankrupt. Mr. Terwilliger maintained there was sufficient evidence to indicate check-kiting, where Mr. Potter disagreed. Mr. Potter summarized his own opinion by stating that the pattern of activity in the checking accounts was what would normally result from a random business activity between two commodities dealers.

The Court in viewing the evidence of the experts presented, believes that there was insufficient evidence presented to prove the existence of a check-kiting scheme. Because of this finding, the Court will not address whether the check-kiting proves lack of fair consideration.

## II

Section 67(d)(2)(c) states the following: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent ... (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes

that he will incur debts beyond his ability to pay as they mature; . . . ."

Although actual intent is not specifically eliminated here as it is in subsections (a) and (b), subsection (c) is different, in that the intent only lies with the belief that debts will be incurred beyond the debtor's ability to pay them as they mature. *Collier on Bankruptcy*, Vol. 14, Section 67.36, at 527, 14th Ed. (1979). In proceeding under this subsection however, the Trustee must show more than just a chronological relation between the act of the Bankrupt and the subsequently incurred debts. Proof must be adduced sufficient to justify the conclusion that the transfer was contemporaneous with an intent or belief that his subsequent creditors will be injured. *Lackawanna Pants Manufacturing Co. v. Wiseman*, 133 F.2d 482 (6th Cir. 1943).

There was no proof to establish that any obligations were entered into with Clemente believing that he could not pay them. The Trustee again only rests upon the existence of the check-kiting scheme for his proof. The only debt proven at the trial as being unable to be paid, was a debt Clemente owed to Hendrickson for merchandise, where Clemente's check was returned unpaid because of insufficient funds. The mere fact that Clemente listed creditors on his bankruptcy schedules does not prove that he incurred these debts knowing they were beyond his ability to pay them. The Court does not believe the evidence was sufficient to establish this point.

### III

Section 67(d)(2)(b) states the following: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent . . . (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; . . . ."

Subsection (b) of Section 67(d)(2) requires a showing of a transfer which leaves an unreasonably small amount of capital upon which the Bankrupt can run his business. This subsection is not relevant here because of the nature of the business in which Clemente was engaged. Being a dealer in coins, he had a minimal overhead. After the initial outlay, he only needed a sufficient amount of capital to buy one coin to sustain his business.

### IV

Section 67(d)(2)(a) states the following: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent . . . (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; . . . ."

Subsection (a) of Section 67(d)(2) requires the transfer to leave the debtor insolvent. The Bankruptcy Act states in Section 67(d)(1)(d) that "a person is 'insolvent' when the present fair salable value of his property is less than the amount required to pay his debts. . . ." The trustee must bear the burden of proving that the bankrupt was insolvent at or near the time of transfer. If the trustee adequately meets that burden, then the defendant must rebut that evidence. *Inland Security Co., Inc.*, (supra.) Insolvency need not be proven at the exact time of the transfer, but may be shown by the conditions existing proximately before or after the transfer. *Inland Security Co., Inc. v. Kirshner*, 382 F.Supp. 338 (W.D.Mo.1974).

The state of Clemente's records shows that it would be nearly impossible to determine at what point Clemente was rendered insolvent. This Court ruled in a prior suit by Pantalejmon and Nancy Dziad against

Clemente that his books and records were insufficient to reveal his financial condition as required by the Bankruptcy Act. The Court sustained Plaintiffs' Objection and denied Clemente's discharge.

When questioned at the trial about his solvency or insolvency, Clemente could not specify with certainty a particular time, but stated that he "got into trouble financially . . . during the summer of '74."

In determining whether Clemente was insolvent or solvent for these proceedings, the Court will accept Mr. Clemente's statement in light of the other evidence presented at trial, and find that he was insolvent.

## V

Returning to the parameters of Section 67(d)(2), it appears that the first two necessary elements were met, namely the transfers were made within one year of the filing of the petition, and there were creditors existing at the time of the transfer. So even assuming that Clemente was insolvent, the final hurdle of fair consideration must be met. As previously stated, *both* conditions must be met for a finding of fraud.

The common thread in subsections (a), (b) and (c) is fair consideration. According to the Bankruptcy Act, fair consideration has two elements: good faith and a fair equivalent value. Section 67(d)(1)(e) states the following:

"... [C]onsideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained."

The term *fair consideration is not a slight* standard and has a stricter connotation than good or valuable consideration. *Inland Security Company, Inc.* (supra.); *Cole v. Loma Plastics*, 112 F.Supp. 138 (N.D.Tex. 1953); *Collier on Bankruptcy*, Vol. 4, Section 67.33, p. 503 (14th Ed. 1972). Fair equivalent means that the consideration must not be disproportionately small as compared to the property transferred. *Inland Security Co., Inc.* (supra.) It is clear that satisfaction of an antecedent debt or the securing of an antecedent debt will qualify as fair consideration. *Cohen v. Sutherland*, 257 F.2d 737, 742 (2nd Cir. 1958); *Inland Security Co., Inc.*, (supra.) Clemente urges that all of the check transfers between he and Hendrickson were for the purchase of merchandise. Hendrickson calls them short-termed loans. Both explanations appear to be consistent. For if they were "short-termed loans" as Hendrickson characterizes them, they could still be for the ultimate purchase of merchandise by Clemente as he indicates. There was no evidence contradicting this implication. This would mean that the transfers from Clemente to Hendrickson were either for antecedent debts, where Hendrickson loaned money to Clemente for merchandise, or they could have been repayment of short-termed loans from Hendrickson for the purchase of merchandise. If they were loans from Hendrickson, it must be decided whether they were made in good faith and were a fair equivalent. These short-termed loans carried no interest, appeared to be made solely upon professional representations, and also appeared to be fairly common among the dealers.

Is the benefit of being offered first choice of goods at a price where resale would include a profit—a fair equivalent consideration for the money loaned? For as explained by the coin dealers, if A loaned money to B so that B would be able to purchase a particular shipment of goods, then A would be able to choose whether he wanted to buy the goods from B at a price where resale would bring a high profit. This Court believes that the benefit coupled with a reciprocal loan at a future time if needed, would constitute a fair equivalent. In essence, the consideration would be such that each would have instant credit at a future time when it was needed. Accordingly, the Court finds that there was fair consideration present in the business relationship between Clemente and Hendrick-

son. The argument of fraud must fall since only one of the two conditions was met.

The Trustee has not sufficiently met the burden of proof to avoid any transfers as fraudulent under Section 67(d)(2) of the Bankruptcy Act. Therefore it is

ORDERED, ADJUDGED AND DE-CREED that the Trustee's Amended First Claim For Relief in his Amended Objection To Allowance Of Claim be, and it hereby is denied.

As to the Proof of Claim of Hendrickson, there was sufficient proof in the invoices attached to the claim and the testimony at the trial to establish the validity of his claim in the amount of Two Hundred Nineteen Thousand Nine Hundred Ninety-Six and $^{77}/_{100}$ Dollars ($219,996.77). No proof was offered sufficient to refute this claim. Therefore it is further

ORDERED that the Proof of Claim of Leon Hendrickson in the above stated amount be, and it hereby is, allowed.

In so reaching these conclusions, the Court has considered all the evidence presented whether or not referred to specifically in the opinion above.