**IN re KZK LIVESTOCK, INC., an Illinois corporation, Debtor.**

**Richard E. BARBER, not individually but as Trustee of the Estate of KZK Livestock, Inc., Plaintiff,**

v.

**UNION NATIONAL BANK OF MACOMB, Defendant.**

**Bankruptcy No. 91–82986. Adv. No. 93–8303.**

United States Bankruptcy Court, C.D. Illinois.

Jan. 11, 1996.

Douglas S. Slayton, Kavanagh, Scully, Sudow, White & Frederick, P.C., Peoria, IL, Alan L. Fulkerson, Riordan, Larson, Bruckert & Moore, Chicago, IL, for Plaintiff.

Lawrence J. Kwacala, Flack, McRaven & Stephens, Macomb, IL, for Defendant.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

The matter presently before the Court is the Plaintiff's motion for partial summary judgment on Count I of his complaint brought under § 548(a)(1) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1), alleging payments made by the Debtor to the Defendant were fraudulent conveyances in that they were made with actual intent to hinder, delay or defraud creditors. The basic facts giving rise to this litigation are as follows.

The Debtor was a corporation engaged in the business of raising feeder pigs. Kendall Z. Knowles (KNOWLES) was its sole shareholder, president, and principal operating employee. In late 1990 and early 1991, the Defendant loaned money to KNOWLES, his brother-in-law, Mitchell Welsh (WELSH), their wives, and a corporation controlled by WELSH. Between February and December of 1991 KNOWLES devised and perpetrated a check kiting scheme. Between February and sometime in August of 1991 the check kiting occurred between a bank account maintained by the Debtor at the First National Bank of Blandinsville (FNBB) and a bank account maintained by KNOWLES under the name of Kendall Knowles Farm Ac-

count at the Colchester State Bank. From sometime in August until December 13, 1991, the check kiting occurred between the bank account at FNBB, and a bank account maintained by another corporation controlled by KNOWLES, Lamoine Valley Pork, at the Defendant/Bank. In June and July, the Debtor paid the Defendant $104,311.06. In 1992, KNOWLES was charged, and pled guilty to federal bank fraud charges arising out of the check kiting scheme.

On December 27, 1991, an involuntary petition in bankruptcy was filed against the Debtor. On August 24, 1993, the Debtor consented to the entry of an order for relief. Thereafter, the Plaintiff was appointed Trustee and he brought a ten count complaint against the Defendant seeking to recover a variety of payments made by the Debtor to the Defendant. Count I seeks to recover the $104,311.06 as a fraudulent conveyance under § 548(a)(1) of the Bankruptcy Code.

■ Section 548(a)(1) provides as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

The Plaintiff contends that the payments to the Defendant occurred within the appropriate time period, the Debtor had a property interest in the kited funds used to make the payments and that KNOWLES' guilty plea to bank fraud is *prima facie* evidence of intent to hinder, delay or defraud the Debtor's creditors. The Defendant opposes the motion for partial summary judgment on the grounds that numerous questions of fact are raised as to whether the Debtor made the payments with the actual intent to hinder creditors and by its affirmative defenses.

This Court agrees with the Defendant that there are questions of fact which prevent the entry of summary judgment. Based on the motion, supporting documents, and the Defendant's opposition and supporting documents, a major factual question involves KNOWLES' intent. Section 548(a)(1) requires that the debtor actually intended to hinder, delay, or defraud its creditors through the payments made by it to the Defendant. To establish that element, the Plaintiff relies on KNOWLES' guilty plea. That reliance is insufficient. The Plaintiff's position is that a ruling in his favor on this motion for partial summary judgment would permit him to recover every transfer that the Debtor had made during the year prior to bankruptcy, unless the transferee has an affirmative defense. From the first time a kited check was written on the Debtor's account, the Plaintiff would have the Court find that the Debtor intended to defraud a creditor, the Banks where the accounts were located, and later perhaps other creditors. Because the Debtor has this general intent, it would taint every transfer thereafter made. The burden then would shift to the transferee. If a transferee is able to show that the Debtor received in exchange for the transfer reasonably equivalent value, and if the transferee received the transfer in good faith, the transferee could retain the interest in property to the extent value was given under § 548(c).

It is important to distinguish between KNOWLES' intent while engaged in the kiting scheme to provide funds for the Debtor's operations and his intent in using those funds so generated to pay the Debtor's creditors. His intent in generating funds, may not be the same as in spending the funds. It is undeniable that KNOWLES defrauded the Banks through the check kiting scheme by writing checks between them. In his proposed plea agreement and stipulation of facts, KNOWLES admits that he executed a scheme to defraud a financial institution. The agreement states that during the time from September 1, 1991, to November 30, 1991, a total of 303 checks resulting in excess of eighteen million dollars in kited funds between the Lamoine Valley Pork account at the Defendant bank and the Debtor's account

at FNBB. KNOWLES' affidavit states that he kited checks between the Debtor's account and the Kendall Knowles Farm account between March, 1991, and August, 1991. His guilty plea stands as *prima facie* evidence of a pervasive, actual intent to defraud the Banks being used for the kiting. But it is only those transfers which are deemed conclusively fraudulent.

As to other creditors, who were not part of the kiting scheme and who received payments from the Debtor, the guilty plea has no significance because it does not show that the payments to the other creditors with regard to each and every transaction that occurred during the period of the kiting were made with an intent to defraud anyone.

At the time of the payments in question, which are being attacked in Count I, Union was not being used for the kiting scheme. Its status was the same as any non bank creditor who received a payment from the Debtor. It received payments on debts owed it. As to those types of payments nothing has been submitted as to KNOWLES' actual intent.

In the context of § 548(a)(1) the courts look to the surrounding circumstances to determine intent. 4 *Collier on Bankruptcy*, ¶ 548.02. Its determination cannot be by some mechanical means. *Collier* states:

> Since section 548(a)(1) requires an actual intent to hinder, delay, or defraud, its application cannot be mechanical. As Judge Hough so aptly said:
>
>> The elements productive of that intent ... can never be defined. They vary as do facts, and any judge or jury, dealing with facts by some rule of thumb, will always miss the human touch. Testimony can never be tested or weighed by machine.

KNOWLES' check kiting scheme may be a factor to be considered, but it is not controlling.

The cases which the Plaintiff relies on to support his proposition that KNOWLES' plea of guilty to bank fraud is *prima facie* evidence of intent to defraud the Debtor's creditors are factually inapposite. Those cases do not involve check kites. *In re Mark Benskin & Co., Inc.*, 161 B.R. 644 (Bkrtcy. W.D.Tenn.1993), cited in the Plaintiff's brief, involved a Ponzi scheme, and it appears that the court rendered its decision after a trial. Holding that the transfers were avoidable under § 548(a)(1), the court stated:

> The Trustee's complaint relied upon the transfers being made with the debtor's "actual intent to hinder, delay, or defraud" other creditors. 11 U.S.C. § 548(a)(1). The proof demonstrated that the debtor, and its principal Mark Benskin, knew when paying the Maples that there were insufficient assets to satisfy other creditors. The debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding. The indictment to which Mr. Benskin and his company pled guilty is Exhibit 12 to the evidentiary deposition of Mr. Benskin, and it clearly alleges a scheme by both Mr. Benskin and his solely controlled company to defraud creditors, including a scheme to control the investors' funds and to use those funds for the debtors' benefit. By pleading guilty the debtors admitted, among other things, misappropriation of customers', including Beverly Poston's, funds and misrepresentation to customers of the status of or return on their investments.

Later on in the opinion, the court commented:

> The Court does not believe that any of the parties deny the debtor's fraudulent intent and there can be no doubt of it. As one court observed "[t] statutory language makes it plain that one can infer an intent to defraud from the mere fact the Debtors were operating a Ponzi scheme."

On appeal, *In re Mark Benskin & Co.*, 1995 WL 381741, 1995 U.S.App. LEXIS 16053, the court affirmed, stating:

> We believe the district court correctly found, pursuant to section 548(a)(1), that when Benskin transferred funds to the Maples and the Hollies, he made the transfers with the actual intent to hinder, delay,

or defraud his present or future creditors. In determining whether the debtor has the requisite intent, this court looks to the circumstances surrounding the transaction. One of the circumstances that unequivocally evidences fraudulent intent is the debtor's pursuit of a classic Ponzi scheme. Since 1966, this court has found that the question of intent to defraud in a Ponzi scheme " 'is not debatable.' " Other courts have also noted that an intent to defraud can be inferred as a matter of law from the mere fact that the debtor was running a Ponzi scheme:

> One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

Based on the facts presented at trial and the indictment to which Benskin pled guilty, the bankruptcy court had more than enough evidence to find that Benskin had the requisite intent to defraud his investors. (Citations omitted.)

There are fundamental differences between the Ponzi cases relied on by the Plaintiff and the facts of this case. The analogy that the Plaintiff makes is faulty. A Ponzi scheme cannot last forever and the investors at the end of the line will come up empty. Therefore, an intent to defraud, with regard to the last investor, can be inferred from the very beginning. This "fraudulent intent permeates the whole scheme and the courts have found an intent to defraud in a Ponzi scheme "not debatable." The challenged transfers involve payouts to other investors. Thus, as the court found in *In re Mark Benskin & Co.*, the debtor, when making the transfer of Ponzied funds, need only have the actual intent to defraud a creditor, whether an early or later investor.

In the present case, the Debtor had ongoing legitimate businesses apart from the check kiting scheme. All KNOWLES' criminal conviction establishes is that he defrauded the Banks by writing checks between them. It is only those transfers which are conclusively fraudulent. While the kite was going on, KNOWLES did have the "intent to defraud a creditor" but there is no showing that he made the challenged payments to Union with the intent to defraud the Banks or any other creditor. The check kiting, like a Ponzi scheme, comes to a point of no return where the check kiter could never find a way out. At that point, every transfer might be made with an intent to defraud creditors, for the check kiter would not be able to pay them all. Whether the Debtor was at that point when the transfers were made to Union would present a question of fact.[1]

The rule that a Ponzi scheme evidences an intent to defraud, does not necessarily apply to a check kite. In *In re Drayer*, 29 B.R. 831 (Bkrtcy.D.Mass.1983), the bank argued that the debtor was collaterally estopped from relitigating the issue of fraudulent intent in a non-dischargeability action based upon a determination of liability in a prior state court civil action for check kiting. Rejecting the

---

1. KNOWLES was somewhat equivocal with regard to whether the Debtor was insolvent at the time the transfer was made to the Defendant. Apparently, the Debtor had funds which were tied-up in KNOWLES' speculation attempts. But whether these funds, had they not been lost or forfeited, could have covered the kite is conjecture and likely wishful thinking on his part. With regard to his commodity trading, KNOWLES stated, "I meant for, you know, I thought in my mind that I had all the bases covered and it would end up being profitable, but if not it would come out of their pocket in the end, anyhow." (Dep. p. 74) He characterized his perception of the check kiting at the time as "minimal," but agreed that in retrospect that such belief was not accurate. (Dep. p. 67)

bank's contention and refusing to decide the matter on a motion for summary judgment, the court stated:

> [The state court judge] found that the debtor was liable as a matter of law for the overdrafts. He did not make the finding of fraudulent intent which would be necessary under § 523(a)(2)(A), and which would make collateral estoppel appropriate. [The state court judge] found that the bank was empowered to pay overdrafts pursuant to [the UCC] and that the one who caused the overdraft is liable as a matter of law for any loss.... Although [the state court judge] did state that the debtor was involved in a "check kiting scheme," the finding merely describes the action of the debtor in writing checks in very large amounts, depositing that check with another bank and then writing a check against that deposit before the first check has cleared; it is not a finding of fraudulent intent to deceive or the making of a false statement. (Citation.) The plaintiff cites the case of *Stevens v. United States*, 227 F.2d 5 (8th Cir.1955) to stand for the proposition that a finding of a check kiting scheme is equivalent to a finding of fraud. In *Stevens*, the court affirmed a jury finding that a check kite was a willful scheme to defraud. While it may be true that check kiting is commonly found to be fraudulent conduct, such a determination was neither made nor was it essential to the finding of liability, and is an issue of fact which has not yet been determined. Because the state court did not make the finding of fraud in fact, collateral estoppel is not appropriate.

Noting that the debtor had admitted engaging in check kiting, the court continued:

> However, the debtor asserts that [the bank] has never proven that he acted with the requisite fraudulent intent. In his affidavit, the debtor states that although he wrote the checks which created the overdraft, he had made deposits of checks from [another], which the debtor expected to be collected. He also claims that the bank was aware of the overdrafts and they were created with the bank's consent. The debtor states that he fully expected the check overdrafts to be covered.

> A motion for summary judgment can only be granted if there exists no genuine issue of fact. Further all inferences contained in the affidavits and exhibits must be viewed in the light most favorable to the party opposing the motion for summary judgment. Although plaintiff argues that debtor's admitted participation in creating the check overdrafts should lead to a presumption of fraud, the court should not on a motion for summary judgment draw fact inferences. The issue of fraud and the requisite intent under § 523(a)(2)(A) must be tried by this Court. The plaintiff's motion for summary judgment is denied. (Citations omitted.)

In *In re Clemente*, 15 B.R. 937 (Bkrtcy. N.D.Ohio 1981), the court, again after a trial, rejected the trustee's contention that the existence of a check kiting scheme established an actual intent to defraud. The court stated:

> Check-kiting is properly defined in the case of *Federman v. United States*, 36 F.2d 441 (7th Cir.1929), wherein the Court expressed that check-kiting was the following:

> "... a plan whereby the perpetrator intended to get, and did get, money from one bank upon the representation of the check, which was a representation that there was money in the bank on which the check was drawn, when as a matter of fact there were no funds in the drawee bank, without any power in the drawer of the check to provide funds to pay such check, except by drawing a like check under like circumstances, constituted a scheme to defraud. This does not mean that every drawer of a check against an account where he has no funds is guilty of a scheme to defraud. This does not mean that every drawer of a check against an account where he has no funds is guilty of a scheme to defraud, but, when the undertaking is such that the checks must be drawn in rapid succession from one bank to another in an endless chain, as here, a scheme to defraud is shown." at 442.

The cases cited by the trustee dealing with check-kiting all include a requirement of actual intent. where the defendants knowingly kited checks to defraud creditors. (Citations.) Upon examination of these cases, it appears that the majority of check-kiting cases are in a criminal setting, dealing with the criminal code. Thus, it is difficult to draw any correlations between those cases and the case at bar [objection to claim on basis that claimant had received fraudulent transfer.] The analysis here shall be made exclusively in the context of the Bankruptcy Act, and makes no representations whether the activity involved fits the requirements of criminal code violations.

It is clear that if one intentionally entered such a scheme, he would necessarily be misrepresenting his financial status. However, as the *Federman* case (supra.) indicated, the mere use of uncollected funds is not of itself proof of an intent to defraud, for a reasonable expectation of repayment would in many cases tend to negative the issue of intent. (Citation.)

Summary judgment is also inappropriate because the Defendant has pled two affirmative defenses specifically directed to Count I which raise questions of fact. Under Count I the Plaintiff contends he is entitled to summary judgment because there was no obligation between the Debtor and the Defendant. The payments made to the Defendant were not for the benefit of the Debtor, but were applied by the Defendant to satisfy personal indebtedness of KNOWLES and WELSH. The Defendant contends, first, that the Debtor received reasonably equivalent value from the transfer by the Defendant to Southwest Feed & Grain (SOUTHWEST), another entity owned and controlled by KNOWLES, by reason of the close business relationship of the Debtor and SOUTHWEST, so that the Debtor then "evened out" when it paid the obligation of SOUTHWEST. Second, the Defendant contends that the Debtor was paying a constructive dividend to KNOWLES when it made the payment to the Defendant on behalf of KNOWLES. The questions of fact raised by the Defendant are whether the Debtor received "reasonably equivalent value" and whether the

Debtor owed KNOWLES at the time the payment to the Defendant was made.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion entered this day, IT IS HEREBY ORDERED that the Motion filed by the Trustee for Partial Summary Judgment is hereby DENIED.